## PICKING et al. v. PENNSYLVANIA R. CO. et al.

### No. 8663.

Circuit Court of Appeals, Third Circuit.
Argued Feb. 6, 1945.
Decided Aug. 28, 1945.
Rehearing Denied Oct. 3, 1945.
See 152 F.2d 753.

---

[1] See Screws v. United States, 65 S.Ct. 1031, citing Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

Ida M. Picking, for appellants.

Spencer G. Nauman, of Harrisburg, Pa., for Pennsylvania R. R. Co.

Edmund C. Wingerd, of Chambersburg, Pa., for Benedict et al.

James A. Strite, of Chambersburg, Pa. (Edwin D. Strite, of Chambersburg, Pa., on the brief), for Kell et al.

Wm. M. Rutter, of Reading, Pa. (James H. Duff, Atty. Gen., on the brief), for Arthur H. James et al.

Before BIGGS, Circuit Judge, and FORMAN and LEAHY, District Judges.

244

BIGGS, Circuit Judge.

Ida M. Picking and Guy W. Picking brought suit against The Pennsylvania Railroad Company, a Pennsylvania corporation, and twenty-three individual defendants, claiming compensatory and punitive damages totalling $1,120,050. The plaintiffs allege that they are citizens of Maryland. Thirteen of the individual defendants are alleged to be citizens of Pennsylvania; ten of the individual defendants are alleged to be citizens of New York. Jurisdiction is based first upon diversity of citizenship and there is an allegation of jurisdictional amount. Jurisdiction of the cause is also asserted to lie in the District Court by virtue of the provisions of the Constitution of the United States [1] and of certain federal statutes.[2]

 Mrs. Picking appears pro se and also for the other plaintiff, her husband. She has stated that she is a member of the bar but her pleading is inept. The complaint contains one hundred and fifty-four paragraphs and is difficult to follow and understand. The suit was dismissed on the motions of certain of the defendants. It is appropriate, therefore, to refer to the decisions of the Supreme Court in Polk Co. v. Glover, 305 U.S. 5, 59 S.Ct. 15, 83 L.Ed. 6; and Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281. In the latter case it was said by Mr. Justice Stone and Mr. Justice Cardozo in the concurring opinion, id. 293 U.S. at page 213, 55 S.Ct. at page 193, 79 L.Ed. 281, "We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer." The court below should have applied the rule of Ghadiali v. Delaware State Medical Society, D.C.Del., 48 F.Supp. 789, 790, and Allen v. Corsano, D.C.Del., 56 F.Supp. 169, 170, that where a plaintiff pleads pro se in a suit for the protection of civil rights the court should endeavor to construe the plaintiff's pleading without regard for technicalities.

The following appears from the exhibits attached to the complaint. On November 1, 1940 Mrs. Picking and her husband were arrested in New York City and charged with the misdemeanor of placing an advertisement on a flag of the United States in violation of subdivision 16, par. a of Section 1425 of the Penal Law of New York. Conviction for this misdemeanor might have subjected the plaintiffs to a maximum imprisonment of one year and a fine not exceeding $500. On or about November 26, 1940 an information was filed by the defendant, Thomas E. Dewey, then District Attorney of New York County, in the Court of Special Sessions, County of New York, charging the plaintiffs with the commission of the misdemeanor.

What then happened in New York is far from clear. There is some indication from notations on the back of the copy of the information that the Pickings were convicted of the misdemeanor charged and put upon parole; that on February 5, 1941 Mrs. Picking's parole was revoked and a bench warrant was issued for her. The copy of the bench warrant attached to the complaint in the case at bar indicates, however, that the Pickings had not been tried. If a bench warrant was issued for Mr. Picking no copy of it is attached to the complaint. It appears that Mrs. Picking could not be found in the State of New York for on September 8, 1941 an affidavit of flight was made by the defendant Bryant, a New York City policeman as a principal complaining witness, stating that he was informed by a detective of the Police Force of New York City that Mrs. Picking had been arrested in Chambersburg, Pennsylvania, and was in custody there "pending the action of the executive of this state in the institution of proceedings for her extradition." On September 9, 1941 District Attorney Dewey issued a request to the defendant Herbert H. Lehman, then Governor of New York, for a requisition upon the defendant Arthur H. James, then Governor of the Commonwealth of Pennsylvania, seeking the extradition of Mrs. Picking as a fugitive from the justice of the State of New York. If a request was also made for the extradition of

[1] Article I, Section 9, Clause 2; Article III, Section 2, Clause 1; Article IV, Sections 1 and 2; and the Fourteenth Amendment.

[2] Section 24 (12) and (14) of the Judicial Code, 28 U.S.C.A. § 41 (12) and (14) and the Third Civil Rights Act, Act of April 20, 1871, 17 Stat. 13, 8 U.S.C.A. § 47 (2)

and (3). The complaint also alleges that jurisdiction is based on the Act of June 22, 1932, 47 Stat. 326, as amended by the Act of May 18, 1934, 48 Stat. 781, 18 U.S.C. A. § 408a, known as the Lindbergh Act, and other sections of the Criminal Code, including Section 662 (18 U.S.C.A.), the Extradition Section.

Mr. Picking, no copy of it is attached to the complaint. In his application to Governor Lehman Mr. Dewey named the defendants Fitzpatrick and Graham and one Dwyer as agents to bring the Pickings back to New York.

Governor Lehman issued a request to Governor James for the arrest and extradition of Mrs. Picking from Pennsylvania. On or about September 13, 1941, an assistant deputy attorney general of the State of Pennsylvania informed Governor James in writing that the requisition for the rendition of Mrs. Picking was in due form and complied with all requirements of law. On September 13, 1941, a governor's warrant, addressed to any peace officer in the Commonwealth of Pennsylvania, was issued by Governor James for the arrest of Mrs. Picking. The copy of the return to the governor's warrant attached to the complaint states that the defendant Winger executed the warrant on August 15, 1941, purportedly twenty-nine days before the issuance of the warrant by Governor James as shown by its face. It is difficult to see how a warrant can be executed prior to its issuance. The date of execution shown upon the return may be erroneous or the executing officer may have arrested Mrs. Picking prior to the issuance of the warrant in expectation of its issuance and made the return in the form indicated for this reason. These questions cannot be answered on the present record.

Turning now to the complaint as distinguished from the exhibits attached to it, we find that it alleges in substance that on August 15, 1941 at Greencastle, Pennsylvania, the defendants Sweeney, Mackey and Rotz "forcibly and unlawfully seized the plaintiffs" in order to imprison them; that this seizure was based on a telegram sent by the defendant Judge Louis Costuma which, in turn was "based on a Bench Warrant issued by [him as] a justice of an inferior court of New York City"; that "the authority to arrest [the Pickings] thereunder was limited" to New York City; that the bench warrant was "unlawfully issued on a falsified and substituted pleading" in that the original complaint filed against the plaintiffs charged them with displaying a flag picture, with an advertisement on their car whereas the substituted pleading charged the plaintiffs with placing an advertisement upon a flag of the United States on their car; that the defendants Sweeney,

Mackey and Rotz used undue force in arresting the plaintiffs and inflicted physical injuries upon them in making the arrest. The complaint also alleges that following this arrest, the defendant was denied a hearing by the defendant Kieffer, a justice of the peace, and that they were imprisoned in the Franklin County jail in Chambersburg by the defendants, the Kells, "without lawful commitments"; that their imprisonment in the Franklin County jail continued on August 16 and that there a petition for a writ of habeas corpus was taken from them by the defendants Benedict, Davidson and the Kells; that on August 16 they were assaulted and injured in the Franklin County jail by the defendants Pouchyba and one of the Kells and were subjected to physical indignities.

The complaint alleges further that at Harrisburg, Pennsylvania, on September 13, 1941, Governor "James unlawfully and maliciously issued purported warrants for the unlawful seizure of plaintiffs on the basis of pretended proceedings for extradition instituted by New York defendants who were falsely purporting to act for the People of the State of New York." There follow a number of paragraphs the contents of which are unintelligible but which seem to charge Governor James with knowledge of certain asserted deficiencies in respect to an unidentified affidavit. Next come allegations that the applications of District Attorney Dewey for requisitions for the plaintiffs to Governor Lehman were insufficient in law, that he maliciously omitted "the true first pleading from his * * * application" and falsified certain other pleadings which were attached to his application for rendition; that Mr. Dewey caused the defendant Bryant to falsify the affidavit of flight hereinbefore referred to; that Mr. Dewey was induced to embark upon this allegedly fraudulent course by the defendants Smythe, Carey, Frooks and Rao.

The complaint also asserts that the original arrest or seizure of the plaintiffs was without warrant of any kind; that the governor's warrant hereinbefore referred to was issued after the plaintiffs' arrest and imprisonment at Chambersburg; that the plaintiffs were taken unlawfully to Harrisburg by certain of the defendants; [3] that Mrs. Picking was robbed of $10 by the defendant Graham; that over their protests, on September 15, 1941, they were transported from Harrisburg to New York by

---

[3] Just which defendants participated in this action is not clear from the complaint.

the defendant, The Pennsylvania Railroad Company. There is no allegation in the complaint stating what transpired upon the arrival of the plaintiffs in the State of New York. In several paragraphs of the complaint it is alleged that the unlawful acts were instituted and encouraged by all of the defendants with the exception of Governor James, Mr. Dewey and The Pennsylvania Railroad Company, but that these defendants "adopted" all the unlawful acts complained of as their own. Other paragraphs of the complaint allege, however, that the defendants, The Pennsylvania Railroad Company, James, Lehman, Dewey, Bryant, Graham, Fitzpatrick, Keiffer, Byer, and Winger "materially and physically participated in" the alleged unlawful acts of September 15, 1941, and the "said unlawful acts were instigated and encouraged by all of the other defendants."

The complaint and the exhibits attached to it in but few instances state the official status of the individual defendants. It appears, however, either from the complaint or the exhibits that the defendant James was Governor of Pennsylvania, that the defendant Lehman was Governor of New York, that the defendant Dewey was District Attorney of New York County, that the defendant Costuma was a magistrate in New York City, that the defendants Fitzpatrick and Graham were detectives of the New York City Police Force designated by Governor Lehman to bring the plaintiffs from Pennsylvania to New York, that the defendant Bryant was a member of the Police Force of the City of New York, that the defendant Winger was an officer entrusted with the task of executing the warrant of the Governor of Pennsylvania, and that the defendant Keiffer was a justice of the peace serving in Pennsylvania. It does not appear, however, either from the complaint or the exhibits attached to it that the other individual defendants were peace officers or officials of either the Commonwealth of Pennsylvania or of the State of New York. The learned District Judge took judicial notice that Governor James was the Chief Executive of the Commonwealth of Pennsylvania at the time of the happening of the events complained of and that the other individual Pennsylvania defendants possessed official status as peace or law enforcement officers of the Commonwealth of Pennsylvania.

■ As to the official status of the defendants James, Keiffer and Winger, the exercise of the principle of judicial notice was unnecessary. As to the other individual Pennsylvania defendants we are of the opinion that the court below was justified in employing that principle to afford them the status of officers or officials of the Commonwealth of Pennsylvania or of political subdivisions thereof. We entertain no doubt that "the requisite notoriety" existed. See Brown v. Piper, 91 U.S. 37, 42, 43, 23 L.Ed. 200. We conclude as well that judicial notice may be taken of the official status of the individual New York defendants.

The complaint contains frequent references to the Uniform Criminal Extradition Act adopted both by the Commonwealth of Pennsylvania and the State of New York. See 19 P.S.Pa. §§ 191.1–191.31 and McKinney's Criminal Code, §§ 827–859. The complaint pleads the Criminal Extradition Act and states that the offense with which the plaintiffs were charged in New York was a misdemeanor subject to a maximum penalty of a year's imprisonment; that therefore they could not be arrested lawfully in Pennsylvania and held for extradition in the absence of a warrant.[4] The complaint pleads that the defendants also acted in breach of the Criminal Extradition Act because the plaintiffs were not taken immediately before a judge of a court of record in Pennsylvania so that the legality of their arrest might be determined;[5] that every proceeding taken against them was illegal because the form of the request made by Governor Lehman and recognized by Governor James was not in accordance with the Act.[6]

None of the New York defendants was served with process and none has appeared. All of the individual Pennsylvania defendants filed or joined in motions to dismiss which with certain exceptions are substantially the same. The grounds of these motions insofar as we deem them pertinent will be discussed at a later point in this opinion.

After argument the learned District

---

[4] See Section 14 of the Uniform Criminal Extradition Act, 9 Uniform Laws Annotated, p. 188.

[5] See Section 10 of the Uniform Criminal Extradition Act.

[6] See Section 3 of the Uniform Criminal Extradition Act.

Judge held [7] that the suit should be dismissed because the complaint failed to conform to the requirements of Rule 8(e) (1) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which states that each averment of a pleading must be simple, concise and direct. The court below held also that the complaint stated no cause of action cognizable under the Constitution or laws of the United States. The District Judge ruled sua sponte that since the New York defendants had not submitted to the jurisdiction of the court, the complaint must be dismissed as to them. He found that no cause of action was stated against The Pennsylvania Railroad Company. The learned District Judge found that Governor James had acted in an official capacity upon certification by the Attorney General of Pennsylvania as to the sufficiency of the requisition executed by Governor Lehman, and his acts were privileged. As to the defendants Sweeney, Mackey and Rotz, J. A. Kell and Mrs. J. A. Kell, Benedict, Davidson and Keiffer, Byers and Winger, the District Judge held that they were officers of the law and acting in line of duty and could not be subjected to civil liability for the acts complained of. The motions to dismiss were granted. The plaintiffs have appealed.

■ An examination of the complaint convinces us that the plaintiffs have attempted to state three separate causes of action.[8] Such a course is permitted by Rule 8 (e) (2). The first cause of action is based upon the Fourteenth Amendment as implemented by Section 1 of the third Civil Rights Act, Act of April 20, 1871, 17 Stat. 13, 8 U.S.C.A. § 43, jurisdiction being asserted to lie in the District Court by virtue of Section 24 (14) of the Judicial Code as amended, 28 U.S.C.A. § 41 (14). The allegations relating to this cause of action assert a conspiracy by the defendants to deprive the plaintiffs of rights gauranteed to them by the Fourteenth Amendment consummated by the overt acts of the individual defendants as hereinbefore referred to and by the corporate defendant. The second cause of action alleged is a conspiracy by the defendants to violate the Uniform Criminal Extradition Act. The third cause of action is based upon an alleged conspiracy by the defendants to subject the plaintiffs to false arrest and to false imprisonment. We will deal with these several asserted causes of action in the order in which we have stated them.

As to the first cause of action the complaint alleges that the defendants, with the exception of certain defendants who "adopted" the conspiracy, conspired to deprive and did deprive the plaintiffs of rights guaranteed to them by the Fourteenth Amendment by arresting and imprisoning them in violation of the provisions of the Uniform Criminal Extradition Act and without legal sanction. As we have stated, the individual defendants for whom no official status is alleged in the complaint may be deemed to be officials of New York or Pennsylvania by application of the doctrine of judicial notice. Allegations of overt acts by the defendants are set out in the complaint. The gravamen of the complaint therefore is a conspiracy to deprive the plaintiffs of their rights under the Fourteenth Amendment and the commission of overt acts by the defendants in carrying out that conspiracy whereby the plaintiffs were deprived of federal rights. The plaintiffs do not allege a denial of equal protection of the laws. They do not assert that the defendants were acting under color of an unconstitutional state law, viz., the Uniform Criminal Extradition Act as adopted by New York and Pennsylvania.

The meaning of the phrase "under color of any law," occurring in Section 1 of the Civil Rights Act of April 20, 1871, 17 Stat. 13, now R.S. § 1979,[9] 8 U.S.C.A. § 43, and in Section 2 of the Civil Rights Act of

---

[7] See Picking v. Pennsylvania R. Co., 3 F.R.D. 425.

[8] It will be observed that in the "preamble" of the complaint, immediately after allegations of diversity of citizenship and jurisdictional amount, the complaint states, "This action *also* arises under the Constitution of the United States * * *." (Emphasis added.)

[9] The fact that the word "law" was omitted from R.S. § 1979, by the revisors is immaterial in the instant case and the effect of the omission need not be discussed here.

R.S. § 1979, 8 U.S.C.A. § 43, in pertinent part is as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * *, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law * * *."

April 9, 1866, 14 Stat. 27, now Section 20 of the Criminal Code, 18 U.S.C.A. § 52, has been the subject of much discussion in the decisions. It was thought that, absent diversity of citizenship, the federal courts did not have jurisdiction to enjoin action by officers of agencies of a state in violation of the Fourteenth Amendment when the so-called state action was prohibited by state law. See Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737; State of Missouri v. Dockery, 191 U.S. 165, 24 S.Ct. 53, 48 L.Ed. 133, 63 L.R.A. 571, and the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Compare, however, the earlier decisions in Ex parte Commonwealth of Virginia, 100 U.S. 339, 346, 25 L. Ed. 676, and Commonwealth of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667. The scope of the decision in the Barney case was circumscribed by Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757. See also Siler v. Louisville & N. R. R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753. But the doctrine of the Barney case was revived in Iowa-Des Moines Nat. Bank v. Bennett, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265, and Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

In United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, in which Section 20 of the Criminal Code, 18 U.S.C.A. § 52, was under discussion Mr. Justice Stone stated, "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law, is action taken 'under color of' state law." The decision of the Supreme Court in Screws v. United States, 323 U.S.——, 65 S.Ct. 1031, 1038, gave broad scope to the provisions of Section 20 of the Criminal Code and virile meaning to the phrase "under color of any law." Mr. Justice Douglas stated:

"It is said, however, that petitioners did not act 'under color of any law' within the meaning of § 20 of the Criminal Code. We disagree. We are of the view that petitioners acted under 'color' of law in making the arrest of Robert Hall and in assaulting him. They were officers of the law who made the arrest. By their own admissions they assaulted Hall in order to protect themselves and to keep their prisoner from escaping. It was their duty under Georgia law to make the arrest effective. Hence, their conduct comes within the statute.

"Some of the arguments which have been advanced in support of the contrary conclusion suggest that the question under § 20 is whether Congress has made it a federal offense for a state officer to violate the law of his State. But there is no warrant for treating the question in state law terms. The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of any law'. He who acts under 'color' of law may be a federal officer or a state officer. He may act under 'color' of federal law or of state law. The statute [Section 20 of the Criminal Code] does not come into play merely because the federal law or the state law under which the officer purports to act is violated. It is applicable when and only when some one is deprived of a federal right by that action. The fact that it is also a violation of state law does not make it any the less a federal offense punishable as such. Nor does its punishment by federal authority encroach on state authority or relieve the state from its responsibility for punishing state offenses."

Mr. Justice Douglas went on to say that Congress by Section 20 of the Criminal Code did not undertake to make all torts of state officials federal crimes; that Congress "brought within § 20 only specified acts done 'under color' of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States." He also said, "We are not dealing here with a case where an officer not authorized to act nevertheless takes action. Here the state officers were authorized to make an arrest and to take such steps as were necessary to make the arrest effective. * * * It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words 'under color of any law' were hardly apt words to express the idea."

The operative language of R.S. § 1979, insofar as is material to the issues presented by this phase of the instant case, is identical with that of Section 20 of the Criminal Code. It follows that R.S. § 1979 must be construed as in pari materia with Section 20. The phrase "under color of any statute * * *" employed in R.S. § 1979 must be construed as was the phrase

"under color of any law" in the Screws case.[10]

The provisions of R.S. § 1979 are sufficiently clear to meet the tests required by the Due Process Clause of the Fifth Amendment. No question as to the sufficiency of the statute to grant a right of civil action should now be heard. Such decisions as Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, and Northwestern Fertilizing Co. v. Hyde Park, Fed.Cas.No. 10,336, forfend it for if a statute is sufficiently clear to afford a court of equity a basis for injunctive relief it will sustain an action for damages. As we read R.S. § 1979 in the light of the Screws decision we are compelled to the conclusion that Congress gave a right of action sounding in tort to every individual whose federal rights were trespassed upon by any officer acting under pretense of state law. A field was created upon which a state officer could not tread without being guilty of trespass and liable in damages. The concept is clear enough but the boundaries of the forbidden territory are ill-defined. Mr. Justice Douglas stated the danger vividly when he said in the Screws decision: "The treacherous ground on which state officials—police, prosecutors, legislators, and judges—would walk is indicated by the character and closeness of decisions of this court interpreting the due process clause of the Fourteenth Amendment. * * * Those who enforced local law today might not know for many months (and meanwhile could not find out) whether what they did deprived some one of due process of law. The enforcement of a criminal statute so construed would indeed cast law enforcement agencies loose at their own risk on a vast uncharted sea." The Screws decision held Section 20 of the Criminal Code constitutional because it contained the word "willfully" and indicated that if that word had not been inserted by the revisers the statute would not meet the test of the Fifth Amendment, citing United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045. But R.S. § 1979 which creates a civil liability for a tortious act cannot be held to be too vague to meet the test of the Fifth Amendment because it does not refer to the state of mind of the tort-feasor.

It follows that if the plaintiffs in the case at bar were deprived of a federal right by state officials or officers acting "un-der color of any law"—or as may be stated more aptly in the instant case "under color of any statute * * * of any State"—these officials must respond in damages to the plaintiffs as prescribed by R.S. § 1979. The allegations of the complaint assert in substance that the individual defendants (officers or officials of Pennsylvania or New York) acting "under color of law" or "pretense" of law deprived the plaintiffs of liberty without due process of law. The plaintiffs have stated a valid cause of action rising under R.S. Section 1979 insofar as the individual defendants are concerned.

In reaching this conclusion we are not unmindful of that sentence in the Screws opinion in which Mr. Justice Douglas stated, "We are not dealing here with a case where an officer not authorized to act nevertheless takes action." The acts of certain of the defendants alleged to have made the arrests of August 15, 1941 might conceivably be deemed to fall within the category designated in the quoted sentence. Arrest of a fugitive from justice not charged with a crime for which he might be imprisoned for more than a year on a "detainer" telegram is a violation of the Uniform Criminal Extradition Act. Cf. Commonwealth v. Rhodes, 8 Pa.Dist. 732, and Cunningham v. Baker, 104 Ala. 160, 16 So. 68, 53 Am.St.Rep. 27. But the complaint alleges that the arrests were made in violation of the Uniform Criminal Extradition Act and hence of the Pennsylvania law. The arresting officers may have thought that they were acting in accordance with the law, but, if the allegations of the complaint are true they were none the less acting under "pretense" of law. It would seem to be a mere play on words under the circumstances of the case at bar to conclude that the acts of August 15th were not "under color of law." As to the arrests of September 13th, these were made by virtue of warrants issued by Governor James.

The corporate defendant, The Pennsylvania Railroad Company, however, is not an agency of any state. It is a privately owned railroad corporation. It has moved to dismiss the complaint upon the ground inter alia, that "There is nothing in the allegations of the Complaint that the Pennsylvania Railroad Company did other than transport as a common carrier the complainants while in the custody of officers of the law." But if, as the plaintiffs assert, this defendant "materially and phys-

---

[10] See note 8 to Mr. Justice Douglas's opinion.

ically participated in" all the alleged unlawful acts of September 15, 1941 it may have joined in, or as the plaintiffs put it, "adopted," the conspiracy as its own. The complaint does not explain how the corporate defendant intra vires could have done so. If the Railroad Company upon the demand of officers of Pennsylvania or New York did nothing more than transport the plaintiffs from Harrisburg to New York City, the plaintiffs being then in the custody of peace officers on warrants valid on their face, the Railroad Company can scarcely be held to have participated in a conspiracy to deprive the plaintiffs of rights guaranteed to them by the Fourteenth Amendment. Neither the defendant corporation nor any of the other defendants moved for a more definite statement of the plaintiffs' claim or for a bill of particulars pursuant to Rule 12 (e). The Pennsylvania Railroad Company has not made use of any of the methods available to compel the plaintiffs to bring their case out in the open. In the absence of such action by the Railroad Company we may not conclude that the plaintiffs have not stated a valid cause of action under the Civil Rights Act against it.

 As we have stated, all of the individual Pennsylvania defendants have filed or joined in the motions to dismiss the complaint. The motion filed by the defendant Benedict, joined in by Governor James, is typical. Section 1 (c) of this motion seeks dismissal of the complaint on the ground that "the alleged tortious acts are all alleged to have been committed by officers of either the State of Pennsylvania or the State of New York or a political subdivision of one of the States, of which fact your Honorable Court should take judicial notice * * *." It is clear from the Screws decision that the actions of police or peace officers performed in an official capacity are not privileged if those actions deprive the individual of federal rights. It follows that the ruling of the court below that the individual Pennsylvania defendants were privileged, cannot be sustained. The learned District Judge determined from the pleading that these individual Pennsylvania defendants "were engaged in the performance of a duty." [3 F.R.D. 429] This was the precise ruling on which the decision in the Screws case turned.

 As to the defendant Keiffer, the complainant alleges that he was a justice of the peace and that he denied and refused a hearing to the plaintiffs upon their arrest on August 15, 1941. If these allegations be proved it may be concluded that the refusal of Keiffer to act as required by law may have deprived the plaintiffs of their liberty without due process of law in violation of the Fourteenth Amendment. If the plaintiffs brought a proper proceeding to secure their liberty before Justice of the Peace Keiffer and he refused to hear their cause, he may be answerable to the plaintiffs in damages. The refusal of a state officer to perform a duty imposed on him by the law of his state because he has conspired with others in a conscious design to deprive a person of civil rights in legal effect may be the equivalent of action taken "under the color" of the law of the state. Note the second count of the indictment in the Classic case wherein it was charged, inter alia, that the defendants refused to count votes cast at a primary election and the language of Mr. Justice Stone from the Classic opinion hereinbefore quoted. In making this statement we are not unmindful of the absolute privilege conferred by the common law upon judicial officers in the performance of their duties. Pertinent authorities relating to the common law privilege are collected and discussed in United States v. Chaplin, D.C.S.D.Cal.C.D., 54 F.Supp. 926, and in Allen v. Biggs, D.C. E.D.Pa., 62 F.Supp. 229. See also Jennings, Tort Liability of Administrative Officers, Selected Essays on Constitutional Law, Vol. 4, pp. 1271-1274. The absolute privilege was extended even to the conduct of judicial officers dictated by malice.[11] But the privilege as we have stated was a rule of the common law. Congress possessed the power to wipe it out. We think that the conclusion is irresistible that Congress by enacting the Civil Rights Act sub judice intended to abrogate the privilege to the extent indicated by that act and in fact did so. Section 1 of the third Civil Rights Act explicitly applied to "any person." R.S. Section 1979 applies to "every person." We can imagine no broader definition. The statute must be deemed to include members of the state judiciary acting in official capacity. The result is of fateful portent to the judiciary of the several states. See the statements of Chancellor Kent in Yates v. Lansing, 1810, 5 John., N.Y., 282, 291, 298. But the policy involved is for Congress and not for the courts. Assuming, as we think we must, that the provisions of Section 1 of the Civil Rights Act must be considered

---

[11] See note 29 at p. 1271, Vol. 4, Selected Essays on Constitutional Law.

with the qualification set out in the last paragraph of footnote 12, infra, as in pari materia with Section 20 of the Criminal Code under consideration, in the Screws case, the conclusion which we have expressed is foreshadowed by that decision, by the Classic case, supra, and by the decisions of the Supreme Court in the cases of Ex Parte Virginia and Virginia v. Rives, supra.[12] For the reasons stated we conclude that the court below erred in dismissing the complaint as to Justice of the Peace Keiffer.

■■■■ What we have said in respect to Keiffer applies to the dismissal of the complaint as to Governor James as the Chief Magistrate of Pennsylvania upon the motion filed by him. One further point, however, arises in respect to Governor James. Statutes of Pennsylvania, the Act of April 9, 1929, P.L. 177, art. V, § 512, and art. IX, § 902 of the same Act, 71 P.S. Pa. §§ 192 and 292, provide that the Department of Justice of Pennsylvania shall have the power and the duty to furnish legal advice to the Governor of Pennsylvania concerning any matter arising in connection with the exercise of his official powers; that if the Chief Executive, having requested and received legal advice from the Department of Justice, bases his official conduct upon such advice, "he shall not be in any way liable for so doing. * * *." Counsel for Governor James contend that the provisions of these statutes relieve him from any liability in the instant case. We cannot agree since the cause of action arises under the Civil Rights Act. We can find no case in point, but the language employed by the Supreme Court in Sola Electric Co. v. Jefferson Co., 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165, is suggestive of the decision which we should reach. It is as follows: "When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation * * * are * * * federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield," citing the Constitution, Article VI, clause 2, and Awotin v. Atlas Exchange Bank, 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393. In Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949, it is stated: "Freedom of speech and freedom of the press * * * are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." See also Deitrick v. Greaney, 309 U.S. 190, 200, 201, 60 S.Ct. 480, 84 L.Ed. 694. Obviously if a state statute purports

---

12 Mr. Justice Douglas stated in the Screws decision, "It [the Classic decision] followed the rule announced in Ex parte Virginia, 100 U.S. 339, 346, 25 L.Ed. 676, that a state judge who in violation of state law discriminated against negroes in the selection of juries violated the Act of March 1, 1875, 18 Stat. 336. It is true that that statute did not contain the words under 'color' of law. But the court in deciding what was state action within the meaning of the Fourteenth Amendment held that it was immaterial that the state officer exceeded the limits of his authority. '* * * * as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or to evade it.' "

In Virginia v. Rives, supra, while the Supreme Court held that the action of the judge in selecting the jury was not a "judicial act," the Court went on to state that even if it were considered to be a "judicial act" the judge would be liable to the penalties provided by the statute. The gravamen of the complaint as to Keiffer in the case at bar lies in the allegation that he refused to perform his judicial function. As we have indicated we can perceive no difference in so far as the third Civil Rights Act is concerned between a judicial officer depriving an individual of a federal right by refusing to act judicially and a judge depriving an individual of a federal right by an action performed in his official capacity as a judge.

A federal officer may be liable to criminal prosecution under Section 20 of the Criminal Code for subjecting a person to the deprivation of his federal rights. See note 2 of the majority opinion in the Screws case. A federal officer, however, may not be sued civilly under R.S. Section 1979 except under the laws of the United States in effect in a territory. The reason for the distinction lies in the fact that the phrase "of any State or Territory" contained in R.S. 1979 is not contained in Section 20 of the Criminal Code.

For the legislative history of the third Civil Liberties Act see The Congressional Globe, 42nd Congress, 1871, First Session, Part 1, report on H.R. No. 320, p. 317 and debate pp. 385, 395, 461 and 495, and Part 2, Appendix, pp. 86, 113, 209 and 216, 217.

to confer immunity upon an official of a state who has violated the provisions of the third Civil Rights Act by depriving an individual of a federal right, the state has invaded the liberties of the individual which are protected by the Fourteenth Amendment. It follows that the court below was in error in dismissing the complaint as to Governor James.

 The court below sua sponte dismissed the complaint as to all the New York defendants, pointing out that they had not been served with process and had not appeared. Of course the New York defendants cannot be compelled to submit to the jurisdiction of the District Court of the United States for the Middle District of Pennsylvania. Camp v. Gress, 250 U.S. 308, 39 S.Ct. 478, 63 L.Ed. 997. See the provisions of Section 51 of the Judicial Code as amended, 28 U.S.C.A. § 112. These need not be detailed or discussed here. It is sufficient to state that the venue provisions of the Section may be waived by the non-resident defendants electing to appear and to defend the cause. We think that a District Court must have broad discretion to dismiss at any time a complaint as to non-resident defendants who have not been served with process. The court in the case at bar, however, erroneously dismissed the case as to all defendants and though it appears from the opinion of the court that the dismissal as to the New York defendants was on the ground that they had not been served with process, the court, when the opinion was written, was about to dismiss the suit in its entirety. This fact may have influenced the discretion of the district judge in dismissing as to the New York defendants since there would have been no point in retaining as parties non-served non-resident defendants while dismissing the complaint as to the resident defendants. We conclude that the dismissal of the complaint as to the New York defendants should be reversed in order to enable the court below to exercise its discretion on remand to determine whether or not the New York parties should be retained as defendants of record at the present stage of the case.

 The second and third causes of action are based upon diversity of citizenship and not upon asserted violations of the third Civil Rights Act. As to the second cause of action, it is clear that the complaint alleges that the plaintiffs were illegally arrested and detained in the execution of a conspiracy to violate the Uniform Criminal Extradition Act. But the Act gives no specific cause of civil action to the individual who may be arrested or imprisoned in violation of its provisions. Non-compliance by any person with the provisions of Section 10 of the Act is made a misdemeanor by Section 11 and a penalty of fine or imprisonment may be imposed. This is a punitive sanction which may be imposed by the State. The Uniform Criminal Extradition Act does not purport to give the injured individual the right to maintain a civil action for either compensatory or punitive damages. The second cause of action asserted by the plaintiffs must be eliminated.

 As to the third cause of action, the complaint does assert a conspiracy to subject the plaintiffs to false arrest and false imprisonment and a consummation of that conspiracy by overt acts committed by the defendants in arresting the plaintiffs without a warrant and without sanction of law. If the allegations be taken to be true, the plaintiffs were subjected to unlawful arrest and detention and the arrest and detention were violations of the Uniform Criminal Extradition Act and were without authority of law. Jurisdiction of such a cause of action may be based upon diversity of citizenship as in the case at bar. The substantive law to be applied is that of the states in which the operative facts took place; viz., Pennsylvania and New York. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

 As to the third cause of action, excluding the third Civil Rights Act from consideration, there is of course authority for the proposition that the Chief Magistrate of a State acting in an official capacity may not be held accountable in a civil suit for damages for his official acts. The liability, if any, of the Governor of Pennsylvania, acting upon a request for extradition made by the Governor of New York, must be determined by the law of Pennsylvania. Governor James' warrant issued, as appears from the exhibits attached to the complaint on the certification of the Attorney General of the Commonwealth. The provisions of the Act of April 9, 1929, P.L. 177, art. V, § 512, are applicable, as are the provisions of art. IX, § 902 of the same Act, 71 P.S.Pa. §§ 192 and 292, hereinbefore referred to. It follows that as to the third cause of action the court below would have been correct in dismissing the complaint as to Governor James were the

only allegations in the complaint concerning him those relating to the issuance of his warrants for the Pickings. The complaint goes further, however, and alleges that Governor James took an active part in the conspiracy. Lack of probability that proof can be supplied in support of this allegation cannot serve as a basis for dismissal for on the present motion for all "well pleaded" allegations must be treated as true. By an appropriate use of the Rules of Civil Procedure and by leave of the court below the plaintiffs may be compelled to draw out the allegations relating to the conspiracy and if the new matter contains nothing pertinent to the defendant James, the complaint should be dismissed as to him insofar as the third cause of action is concerned.

■ The complaint in respect to the third cause of action may not be dismissed as to the other individual Pennsylvania defendants on the ground asserted in Section 1 (c) of the motions hereinbefore quoted. A peace officer in Pennsylvania possesses no authority to arrest a fugitive from justice not liable for a penalty of imprisonment for more than a year without a warrant from a magistrate. See Commonwealth v. Rhodes, 8 Pa.Dist. 732. In the present state of the record it would be fruitless to devote space in this opinion to further discussion of this question of law.

The defendant Roy G. Kell also moved to dismiss the complaint upon the ground that he was not properly served with process. Accompanying the motion is a photostatic copy of a document which was served upon him, purporting to be a summons which, he alleges, does not name him as a defendant. The photostat referred to is so nearly illegible as to afford no basis for discussion or disposition of the issue raised. The court below did not pass upon this ground for dismissal as to Kell. Upon remand the sufficiency of the service upon Kell may be determined by the court below upon a proper pleading.

In respect to the liability of the corporate defendant, The Pennsylvania Railroad Company, under the third cause of action, the complaint alleges that the New York defendants, Fitzpatrick and Graham, detectives of the New York City Police Force, had been designated by Governor Lehman to transport the plaintiffs from Pennsylvania to New York upon extradition. The plaintiffs were in the custody of these two persons, if of no others, when the plaintiffs boarded the corporate defendant's train for transportation to New York. The defendants named were then in possession of the warrant issued by the Governor of Pennsylvania for the arrest of Ida M. Picking. As we have previously stated a copy of the governor's warrant for the arrest of Guy W. Picking is not attached to the complaint though the complaint states that such a warrant was issued. The plaintiffs allege that the warrants were of no legal effect because of an apparent discrepancy in the respective dates of issuance and execution. We cannot determine whether or not the warrant for Mr. Picking was valid upon its face since it is not before us. The warrant for Mrs. Picking, however, is valid upon its face and is not invalidated at least insofar as the corporate defendant is concerned by reason of the apparent discrepancy between the date of issuance of the warrant and the date of its execution.

■ It is well established that a common carrier by railroad is required to accept for transportation as passengers persons in the custody of peace officers under a warrant valid on its face and that a common carrier refusing to accept such a person for transportation is liable for a penalty. Duggan v. Baltimore & Ohio R. Co., 159 Pa. 248, 28 A. 182, 186, 39 Am.St. Rep. 672. See also Burton v. New York Cent. & H. R. Co., 147 App.Div. 557, 132 N.Y.S. 628; Chesapeake & Ohio R. Co. v. Pack, 192 Ky. 74, 232 S.W. 36; Bowden v. Atlantic Coast Line Ry. Co., 144 N.C. 28, 56 S.E. 558, 12 Ann.Cas. 783; Brunswick & W. R. Co. v. Ponder, 117 Ga. 63, 43 S.E. 430, 60 L.R.A. 713, 97 Am.St.Rep. 152. The employees of a railroad company are not required, as the plaintiffs apparently assert, to constitute themselves a court of law in order to determine whether extradition proceedings were validly conducted before accepting as a passenger for transportation a person subject to extradition held upon a warrant valid on its face. We may not assume, however, that the governor's warrant for the arrest of Guy W. Picking was valid on its face since it is not before us. If upon remand the governor's warrant for Guy W. Picking is made a part of the record and it is similar in tenor to the governor's warrant issued for the arrest of Ida M. Picking, it will constitute a valid defense under the Railroad Company's present motion to the specific charge of illegal transportation.

The court below would have been correct in dismissing the third cause of action as to The Pennsylvania Railroad Company insofar as Mrs. Picking is concerned if the complaint contained no allegations other than those relating to the specific charge of illegal transportation. The complaint goes further, however, and in effect alleges that The Pennsylvania Railroad Company took part in a general conspiracy to arrest and imprison the plaintiffs. The plaintiffs should be compelled to draw out their present allegations and particularize them. If the matter which thus comes into the pleading contains nothing more relevant to the charge of conspiracy on the part of the Railroad Company than is now asserted in the complaint, the suit should be dismissed as to The Pennsylvania Railroad Company insofar as any claim asserted by Mrs. Picking is concerned. A like ruling will be appropriate as to any claim asserted by Guy W. Picking against the Railroad Company if it shall appear that he was arrested under a governor's warrant valid on its face.

We have laid emphasis in this opinion upon the failure of the defendants to avail themselves of the machinery supplied by the Rules of Civil Procedure to compel the plaintiffs to bring their case out into the open. It will be appropriate for the court below upon remand to permit the parties sharply to shape the issues of the case by amendments to the pleadings.

The order of the court below dismissing the complaint as to all the defendants is reversed and the cause is remanded with the direction to the court below to proceed in conformity with this opinion.