Henry **HOWELL**, Appellant,

v.

**CATALDI** et al.

No. 71-1455.

United States Court of Appeals,
Third Circuit.

Argued April 13, 1972.

Decided June 26, 1972.

Van Dusen, Circuit Judge, dissented
and filed opinion.

Cassandra Maxwell Birnie, Philadelphia, Pa., for appellant.

John Mattioni, James M. Penny, Jr., Philadelphia, Pa., for appellees.

Before McLAUGHLIN, VAN DUSEN, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Plaintiff has appealed from the direction of a verdict for the defendants in an action brought "under the Civil Rights Statute, the Act of June 25, 1943, 62 Stat. Title 28 U.S. Code Section 1343(3) as amended is [sic] herein after more fully appears, and the 8th Amendment to the United States Constitution."

Plaintiff, a diabetic who demonstrated symptoms of intoxication when he was involved in an automobile accident, contends that in the process of a police investigation of that accident, he was physically assaulted in a Philadelphia police station. He remembers nothing of the incident or occurrences for ten days thereafter, allegedly because of his diabetic condition. He relied upon an eye witness to describe the alleged beating, and introduced no testimony, lay or medical, delineating the nature or the extent of personal injuries he allegedly received.

This appeal admits of no easy resolution. It is a procedural *tour de force*, and the paucity of testimony introduced at trial before a jury did not simplify the task of the district court.

### I.

Initially, we must determine the precise nature of the civil action before the

trial court. This was not a *pro se* proceeding. Plaintiff was represented by private counsel [1] who, on several occasions, orally indicated that she intended to proceed under 42 U.S.C. § 1983.[2] In an application to amend his complaint, plaintiff made reference to § 1983, and the court order permitting the amendment explicitly referred to this statute, but the written complaint and amendment thereto were limited to 28 U.S.C. § 1343(3), described therein as "the Civil Rights Statute" and the Eighth Amendment. Amended paragraph 1(a) averred: "The jurisdiction of this court is invoked under 28 U.S.C. Section 1343(3) being action authorized by law to redress the deprivation, under color of statute, laws of this State, ordinances, regulations, custom, and usage of any right, privilege or immunity secured to plaintiff by the first and fourteenth Amendments of the Constitution of the United States." The claim for relief asked for "redress under the Civil Rights Act as mentioned." [3]

There exist many indications, however, that this proceeding was viewed as an action under § 1983. The defendants attacked the amendment by citing § 1983 cases construing statutes of limitations. In discharging the jury, the court reported: "This case is brought under the Civil Rights Act, a recent Act of Congress passed in 1966, with some amendments since, I believe, but it goes back to an Act of 1873 or '74 known as the Civil Rights Act, which says, very briefly, that any person who deprives another of his constitutional rights acting under color of law is in violation of the Act." [4]

■ Initially, we observe that 28 U.S.C. § 1343(3) is jurisdictional only. It does not supply a basis or a claim for relief. Where there is a deprivation of constitutional rights by state officers the appropriate source of explicit statutory relief is 42 U.S.C. § 1983.[5]

■ To construe these written pleadings, literally founded upon § 1343, as constituting an action under the Civil Rights Act, 42 U.S.C. § 1983, would be comparable to the action of the Supreme Court in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), where the Court held to be sufficient a complaint against *federal* officers alleging naked Fourth Amendment deprivations and relying on the federal question jurisdiction statute, 28 U.S.C. § 1331. Similarly, it would ap-

1. Thus, we are not required to apply the principles of a *pro se* proceedings "which we hold to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

2. The statute provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. Section 1343(3) states in relevant part:
 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 * * * * *
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens of or all persons within the jurisdiction of the United States. . . .

4. As heretofore observed, footnote 2, *supra*, § 1983 is the Act of 1871 and does not apply to "any person who deprives another," but to "every person who, under color" of state action commits the act.

5. Referring to these two statutes in Lynch v. Household Finance Corporation et al., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), a proceeding against a state sheriff, the Court observed that plaintiff "sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3)."

pear that a complaint resting upon § 1343(3) and averring an Eighth Amendment deprivation would also suffice against *federal* officers. What is before us here is an action to redress an alleged invasion of federal constitutional rights by *state* officers, acting under color of state law. Since the cruel and unusual punishment clause has been held applicable to the states through the due process clause of the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), we are at least conceptually consistent with the *Bivens* doctrine, even recognizing the difference that here there are state, rather than federal, officers. Whatever sovereign is served, the law enforcement officer asserting a state or federal authority occupies a formidable role vis-a-vis a private citizen. "The mere invocation of [state or] federal power by a [state or] federal law enforcement official will normally render futile any attempt to resist. . . . 'In such cases there is no safety for the citizen except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime.' " *Bivens, supra,* 403 U.S. at 394–395, 91 S.Ct. at 2004. Although, in the view we take, we do not meet and decide the question, the complaint filed in these proceedings bears a comfortable relationship with that filed by Mr. Bivens. "It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded. 'And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)." J. I. Case Co. v. Borak, 377 U.S. 426,

433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

We therefore look beyond the pleadings here because the district court and all of the litigants proceeded as if this were a § 1983 proceeding. F.R.Civ.P. 15(b) provides "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The instant action appears to represent the paradigm case of an issue not raised in the pleadings, but tried with the implied consent of the parties and the express consent of the court as a § 1983 action for money damages.

## II.

So construing these proceedings, it becomes necessary to determine the precise federal statutory violation or unconstitutional deprivation relied upon by plaintiff. We experience difficulty construing this action as one postulated on the First and Fourteenth Amendments.[6] We view reference to these amendments in paragraph 1(a) of the amended complaint as descriptive only of the contours of the jurisdictional statute relied upon. Indeed, there was not a scintilla of proof elicited at trial evidencing any denial of free expression protected by the First Amendment. On the contrary, the record indicates that a possible cause of the difficulty experienced by Howell emanated from his refusal or inability to speak at the time of his arrest and during the ensuing investigation. Howell offered no proof of lack of probable cause for arrest, unlawful search and seizure, or improper questioning without counsel. Indeed, his entire case is predicated upon the hypothesis that he was involved in an auto accident at a time he was undergoing diabetic symptomatology, a condition resembling intoxication and productive of amnesia. The thrust of his complaint is that the officers used

---

6. Other than as a vehicle making the Eighth Amendment's cruel and unusual punishment clause applicable to the states.

unnecessary and excessive force under the mistaken impression that he was uncooperative when the reality was that he was in the throes of some phase of a diabetic coma.

In addition, in paragraph XII of both the original and amended complaints, the constitutional deprivation appeared limited to an allegation

[t]hat the defendants acted with malice and were wilful and wanton in their acts hereinabove mentioned using excessive force although unnecessary for which punative [sic] damages should be allowed.

This specific averment seems consistent with the opening paragraph of both the original and amended complaints:

This action arises under the Civil Rights Statute, the Act of June 25, 1942, 62 Stat. 932 Title 28 U.S. Code Section 1343(3) as amended is [sic] herein after more fully appears, and the 8th Amendment to the United States Constitution.

Paragraph XI of the original and amended complaints provided:

That as a proximate result of the acts and doings of the defendants and their associates, plaintiff has been injured and also has been depreived [sic] of the equal protection of the laws of the United States. The plaintiff has been compelled to incur the expense of attorneys fees and other legal costs due to the action of defendants herein, all to his damage.

On the basis of these allegations, we find that the specific pleadings are consistent with an allegation of an infliction of cruel and unusual punishment as proscribed by the Eighth Amendment.

Our conclusion is buttressed by the specific manner with which plaintiff's attorney made her opening statement, presented the evidence, and made her final argument to the court in response to the motion for directed verdict.[7]

### III.

Now that we have determined the precise nature of this action and the constitutional deprivation asserted, we must ascertain which of these named defendants are legally cognizable parties to this proceeding.

 Initially, we find that the district court properly dismissed the action

---

7. Opening statement:

Gentlemen of the jury, we have met before. I am Cassandra Birnie. I represent Henry Howell and we expect to show you that this young man is a diabetic patient, he suffers from that, has suffered from that for some time, and that on the day in question he went into a coma and blacked out. The police officer defendants whose first names I don't know, Cataldi and Kinsella, took him from his car, ill-used him; took him to the police station where he was ill-used some more. Eventually he went to the hospital. We will show you from the hospital record what was done. We will show you that his civil rights have been violated both on the outside of the car and inside the police station. We will show you that he has been injured about his person and his constitutional rights have been violated. We hope that you will keep an open mind as we go along in this case. Thank you.

Closing argument:

If Your Honor pleases, it is my thinking that without bringing the officers here all we can talk about is what two officers did, as we did yesterday, but when we read the pleadings and find that they admit that they were there, they took him in and they were at the police station as well as at the intersection; they don't admit beating him, but we do have an eye witness who says this. Our position is that these men were identified by their own admission in the pleadings.

Now, as to the others, they didn't answer and I respectfully say, sir, that not having answered it should be admitted on the pleadings that they were involved. They were agents. They did direct the officers to act, and we have here a brutal beating under the 8th Amendment, which is enforced by I think it is Section 1983, and there was an amendment to add that section of the Civil Rights Act.

We feel that we have shown that there was unusual punishment here; that it was unconstitutional on the part of the police officers at that station.

Thank you, sir.

against the defendant City of Philadelphia. A municipality is not a party within the context of § 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Hunter v. City Solicitor, City & County of Philadelphia, 444 F.2d 1395 (3d Cir.1971); Bush v. Robinson, 442 F.2d 393 (3d Cir.1971); United States ex rel. Gittlemacker v. County of Philadelphia, 413 F.2d 84 (3d Cir. 1969).

■ Further, we agree with the district court's dismissal of the action against defendants Captain Keane of the 25th Police District, Police Commissioner Frank Rizzo, and Mayor James H. J. Tate.

The incident giving rise to this action occurred on December 21, 1966. These individuals were not named in the original complaint, but were added as defendants in the amended complaint, filed May 30, 1970, over three years and five months after the accident. We do not reach the question of whether these defendants can be held liable without proof that they acted personally in the deprivation of plaintiff's rights, cf., Bennett v. Gravelle, 323 F.Supp. 203, 214 (D. Md.1971); Sanberg v. Daley, 306 F. Supp. 277, 279 (N.D.Ill.1969), because we hold that the action against them was barred by operation of the statute of limitations.

The applicable period of limitations in a § 1983 action is that which the state courts would apply if the action were brought in a state court under state law. Butler v. Sinn, 423 F.2d 1116 (3d Cir. 1970); Hileman v. Knable, 391 F.2d 596 (3d Cir.1968). Had this action been brought by plaintiff as a tort action in the Pennsylvania courts, as to these defendants, it would have been barred by the applicable statute of limitations, Act of June 24, 1895, P.L. 236 § 2; 12 Pa. Stat.Anno. § 34:

> Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards. . . .

## IV.

■ Essentially then this appeal resolves itself to whether a *prima facie* case of cruel and unusual punishment was made out against the police officers identified as actually participating in the incident. Clearly, not all tortious conduct subject to liability under state law constitutes "cruel and unusual punishment" under the Federal Constitution. Moreover, this court has already stated: "Nor are we able to perceive that a tort committed by a state official acting under color of law is, in and of itself, sufficient to show an invasion of a person's right under the Act." Kent v. Prasse, 385 F.2d 406, 407 (3d Cir. 1967). Thus, an averment of improper medical treatment was held insufficient by this court to state a cause of action under § 1983, Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir.1970); Fear v. Commonwealth of Pennsylvania, 413 F.2d 88 (3d Cir.), cert. denied, 396 U.S. 935, 90 S.Ct. 278, 24 L.Ed.2d 234 (1969); as was an averment of inferior medical treatment facilities for treatment of an ear infection, Kontos v. Prasse, 444 F.2d 166 (3d Cir.1971); as was an averment of being forced to work in prison on a press which was dangerous and unfit and which had previously been condemned, Kent v. Prasse, *supra,* 385 F.2d at 407.[8]

---

8. See also Fletcher v. Hook, 446 F.2d 14, 16 (3d Cir. 1971), where Judge Van Dusen stated:

> As to the claim under 42 U.S.C. § 1983, the complaint alleges no more than a tort claim for malpractice against the attorney based on contentions that he allowed the criminal case to be brought to trial without proper preparation, he failed to interview witnesses, he refused to attack a defective indictment, causing plaintiff to receive an excessive sentence, and that he did not help plaintiff to appeal. We have consistently held that such a tort claim against a professional man for malprac-

It becomes important to delineate that conduct which is actionable in state courts as a tort, and that which is actionable in federal courts under § 1983. The two rights of action do not always stand *in pari materia.* Some common law and statutory torts, although actionable in a state forum, do not rise to constitutional dimensions. The converse is equally true. Conduct may be actionable as a deprivation of constitutional rights where no force and violence has been utilized, and there exists no orthodox counterpart of state *common law or statutory* relief available. Certain violations of the Fourth Amendment illustrate this principle; and former Chief Justice Warren, in Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (concurring opinion), described the act of denationalization as offensive to the Eighth Amendment: "There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society." [9]

■ A right to relief under § 1983 is not exclusively predicated upon a breach of duty imposed by the law of torts.[10] The seminal case of *Monroe* did not conceptualize the right as one that tracks exclusively the footprints of tort law. Only in the context of distinguishing the element of "wilfully," found in 18 U.S.C. § 242, the criminal counterpart of § 1983, did Mr. Justice Douglas suggest that the civil action "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U.S. at 187, 81 S.Ct. at 484. *Cf.* United States v. Delerme, 457 F.2d 156 (3d Cir. 1972). "The injuries inflicted by officials acting under color of law, while no less compensable in damages by those inflicted by private parties, are substantially different in kind. . . ." *Bivens, supra,* 403 U.S. at 409, 91 S.Ct. at 2011 (Harlan, J., Concurring). "[A] deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both a state tort and the deprivation of a constitutional right." Monroe v. Pape, *supra,* 365 U.S.

---

tice "is not cognizable under the Civil Rights Act." Smith v. Clapp, 436 F.2d 590 (3d Cir. 1970) ; Isenberg v. Prasse, 433 F.2d 449 (3d Cir. 1970) ; cf. Bush v. Robinson, 442 F.2d 393 (3d Cir. 1971) ; Fear v. Commonwealth et al., 413 F.2d 88 (3d Cir. 1969) ; Christman v. Commonwealth, et al., 275 F.Supp. 434, 435 (W.D.Pa.1967), application for leave to proceed on appeal in forma pauperis denied (3d Cir., Misc.No. 893, Orders of 3/11/68 and 4/5/68), cert. den. sub nom. Christman v. Lesher, 393 U.S. 885, 89 S.Ct. 195, 21 L.Ed.2d 161 (1968).

9. Justice Harlan emphasized that the relief afforded by state law would "be far less than what Congress may have thought would be fair reimbursement for deprivation of a constitutional right. . . . There may be no damage remedy for the loss of voting rights or for the harm from psychological coercion leading to a confession. And what is the dollar value of the right to go to unsegregated schools? Even the remedy for such an unauthorized search and seizure as Monroe was allegedly subjected to may be only the nominal amount of damages to physical property allowable in an action for trespass to land. It would indeed be the purest coincidence if the state remedies for violations of common-law rights by private citizens were fully appropriate to redress those injuries which only a state official can cause and against which the Constitution provides protection." Monroe v. Pape, *supra,* 365 U.S. at 196, 81 S.Ct. at 489 (Harlan, J. Concurring).

10. This court has previously described the right as "sounding in tort": "In Hague v. C.I.O., 101 F.2d 774, 789 (3 Cir.), modified, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), we said '[s]uch an action sounds in tort.' In Picking v. Pennsylvania R. Co., supra, 3 Cir., 151 F. 2d 240 at 249 we stated, '[W]e are compelled to the conclusion that Congress gave a right of action sounding in tort to every individual whose federal rights were trespassed upon by any officer acting under pretense of state law.' " Basista v. Weir, 340 F.2d 74, 81 (3d Cir. 1965). We do not so interpret "sound" to mean other than to produce an effect, or make or convey a certain impression.

at 196, 81 S.Ct. at 488 (Harlan, J., Concurring).

The rights protected by § 1983 are public ones, created or adopted by the Federal Constitution or by Congress. By comparison, "[a] tort is an act or omission which unlawfully violates a person's right. . . . It will be observed that the right violated is private not public. This differentiates tort from crime." Burdick, Law of Torts, 1st Ed. pp. 4–5. These federal rights are therefore publicly created, but subject to private vindication. In theory they are akin to the private rights governing the law of torts established either by common law or by statute. But unlike the varying strictures of private tort law, there is a public policy of broad interpretation of the rights sought to be protected. Valle v. Stengel, 176 F.2d 697, 702 (3d Cir. 1949). "The Act prescribes two elements as requisite for recovery: (1) the conduct complained of must have been done by some person acting under color of law; and (2) such conduct must have subjected the complainant to the deprivation of rights, privileges, or immunities secured to him by the Constitution and laws of the United States." Basista v. Weir, *supra*, 340 F.2d at 79. Once there is recognition of the right sought to be vindicated, the proof of the deprivation proceeds "against the background of tort liability." Monroe v. Pape, *supra*, 365 U.S. at 187, 81 S.Ct. at 484.

Thus, although proof of specific intent to deprive a person of his federally protected rights is not required, there must be at least proof of the "condition usually demanded by the law for liability in an action of tort [which] is the existence of either wrongful intention or culpable negligence on the part of the defendant." Salmond, Law of Torts, 6th Ed. 1924, p. 11.

Emphasizing that we are not dealing with a tort *qua* tort, but with an invasion of a constitutional protection, and recognizing that an examination of that protection and the invasion thereof requires the application of "the background of tort liability," we must now decide whether the evidence here amounted to an Eighth Amendment deprivation. This would require proof of:

1. Intentional performance of conduct.[11]

2. Amounting to punishment which is

 a. cruel, and

 b. unusual.

The plaintiff proved that he was a diabetic, having in his possession on that day a card reading, "I am a Diabetic. My behavior during reactions to therapy may resemble that of an intoxicated person." His physician testified that "medical literature . . . is filled with cases of mistakes between a low blood sugar and the type of irregular behavior that is seen in acute alcoholism."

Although diagnosed as "a brittle diabetic," and having the potential of going into shock at any time even with regular administrations of insulin, the plaintiff, incredibly, continued to operate an automobile on the streets of Philadelphia. On December 21, 1966, he collided with an automobile driven by witness McGraw and, as previously observed, plaintiff has no present recollection of this event or of anything subsequent for a ten-day period thereafter. McGraw testified that plaintiff ran into the back of his car, that the police came, that they told him that Howell "was so drunk he was incoherent," that "they tried to get Mr. Howell into the police car but he couldn't bend over or he wouldn't bend over," and that Howell "was just standing there smiling, a big smile, and looking straight ahead and smiling. He wasn't saying anything or doing anything . . . so they told me, well, they will have to call a wagon, and then a wagon came and four officers picked

---

11. Under the facts and evidence in this case, it does not become necessary to reach the question whether there can be an Eighth Amendment cruel and unusual punishment case based on culpable negligence.

him up and put him in the patrol wagon."

McGraw described the assault at the police station, revealing that there were six police officers present, including the two defendants. He testified that Howell

was handcuffed behind his back and there was an officer under each elbow holding him up like this (indicates), you know, under his elbows holding him up, and they walked him up to the counter and then one officer took his hands behind Mr. Howell's head and smashed it to the counter.

\* \* \* \* \* \*

Well they pulled Mr. Howell away from the counter and one hit him in the stomach and he went down on the floor and the other officer had a black jack and he hit Mr. Howell on the head with it.

\* \* \* \* \* \*

Then the other two officers that were in the car when it happened, they were standing there and one picked Mr. Howell and one had a wooden club and started banging on his shins, and this went on for it seemed like a long time, for a few minutes or so, until Mr. Howell stopped squirming.

\* \* \* \* \* \*

A. They asked him if he had enough and he didn't say nothing. He sort of crying, smiling and crying. And they picked him off the floor. . . . They lift him up and two officers were holding him again and they pushed him over on the counter and they unhandcuffed him.

Q. And unhandcuffed him?

A. Yes. Took the handcuffs off and the one officer held his wrist or his hands and then the bigger officer, he stepped back, he was holding his head down, and as he stepped back he sort of shoved him and pulled his hand right back real quick too, like to psyche the man I figured, you know they didn't have to do that.

\* \* \* \* \* \*

In Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971), the Fifth Circuit was faced with a § 1983 claim that plaintiffs were arrested, assaulted, and subjected to the grossest and most humiliating of human indignities by law enforcement personnel in Natchez, Mississippi. In holding that plaintiffs had been denied rights protected by the Eighth Amendment, the court emphasized:

The cruel and unusual punishment clause is a nonstatic, moral precept designed to curb treatment which offends contemporary standards of decency. Until the early part of this century, the ban on cruel and unusual punishment has been interpreted to apply only to outrageous and barbarous practices. *See generally* Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv.L.Rev. 1773 (1970); Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635 (1966). The concept has now expanded, but its precise boundaries are still unclear. Wilkerson v. Utah, 1878, 99 U.S. 130, 135–136, 25 L.Ed. 345 ('Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishment shall not be inflicted. \* \* \*'); Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. Courts have relied upon such imprecise measures as the protection of 'the dignity of man,' Trop v. Dulles, *supra,* 356 U.S. at 100, 78 S.Ct. 590, or 'developing concepts of elemental decency,' Jordan v. Fitzharris, *supra* [D.C.] 257 F.Supp. [674] at 679, 438 F.2d at 190–191.

We subscribe to Judge Goldberg's characterizations of the cruel and unusual punishment clause in *Anderson* as "a nonstatic, moral precept" rather than as a prohibition of grievous tortious conduct. If construed as the latter, there would be a tendency to conceptualize it as something measured by the degree of injuries inflicted, as, for ex-

ample, the upgrading of simple assault and battery to aggravated assault and battery. We do not believe that the extent of injuries received necessarily determines whether unconstitutional punishment was inflicted to one in custody of the police. We therefore deem as immaterial the absence of any medical testimony, either lay or expert, concerning the injuries sustained by Howell. This is not to say that the extent of injuries may not be important in another context in construing the cruel and unusual punishment clause, where, for example, the use of force is grossly excessive to that necessary under circumstances where some application of force is necessary or required. Nor is this to suggest that the use of a wooden club or blackjack by police officers may not be appropriate outside the confines of a jail or prison under limited circumstances, e. g., for proper self-protection, escape prevention, or riot control.

Where, as here, however, the plaintiff was handcuffed, was inside a police station, was at worst a suspected misdemeanant, and was surrounded by six officers, other considerations should dominate.[12] Conceding that answers to basic investigative questions, such as identification, should have been given the police, conceding that Howell was uncooperative, either by reason of intoxication or diabetic coma, or both, conceding that he was resisting his incarceration or restraint, we nevertheless conclude that the physical force inflicted upon him under the circumstances amounted to a *prima facie* case of cruel and unusual punishment against the identifiable, participating officers. Even though "applied in pursuit of a legitimate penal aim"—control of an unruly prisoner—the force applied by the participating officers, i. e., smashing his head against the counter, hitting him on

the head with a blackjack, banging his shins with a wooden club, kicking him, went far beyond the pale of permissible police conduct.

[A] punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. United States [217 U.S. 349] at 370, 30 S.Ct. 544 [54 L. Ed. 793]; Robinson v. California, [370 U.S. 660] at 677, 82 S.Ct. 1417 [8 L.Ed.2d 758] (concurring opinion of Douglas, J.). . . .

Jordan v. Fitzharris, 257 F.Supp. 674, 679 (N.D.Cal.1966).

Nor was it necessary, to bring this claim within the locutions of the Eighth Amendment, for plaintiff to prove that the actors intended to "punish" him. Although that Amendment proscribes the infliction of cruel and unusual "punishment," clearly it was their conduct which pierced the constitutional shield, not their motive. All that is required is proof that the conduct was intentional. There is no requirement of proof of a further objective toward which the conduct is directed. "While a specific intent to deprive a person of his constitutional rights is required under criminal sections of the Civil Rights Acts, 18 U.S.C. §§ 241, 242, neither specific intent nor purpose to deprive an individual of his civil rights is a prerequisite to civil liability under the civil provisions of the Civil Rights Act. See Stringer v. Dilger, 313 F.2d 536 (10 Cir. 1963)." Basista v. Weir, *supra*, 340 F. 2d at 81.

Thus, although what "constitutes a cruel and unusual punishment has not been exactly decided," Weems v. United

---

12. In Butler v. Crumlish, 229 F.Supp. 565, 567 (E.D.Pa.1964), the court neatly observed:

It seems to be forgotten that an accused is not a convict, and that it is only strong necessity that compels his detention before trial. It is a restraint of the liberty of his person which is unavoidable. It should not be aggravated by the infliction of any unnecessary indignity.

States, 217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910), "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, *supra,* 356 U.S. at 101, 78 S.Ct. at 598 (1958) (concurring opinion, Warren, C. J.). We are not unaware of the commonplace rhetoric: "police brutality." And we have heretofore observed that not every application of force by a police officer, even in a prison or police station, offends the law or the Constitution. But where the application of that force exceeds that which is reasonable and necessary under the circumstances, and also "violates standards of decency more or less universally accepted," State of La. ex rel. Francis v. Resweber, 329 U.S. 459, 469, 67 S.Ct. 374, 379 91 L.Ed. 422 (1947) (concurring opinion, Frankfurter, J.), such conduct clearly extends beyond the pale. We find, therefore, that the force visited upon plaintiff by the participating police officers did just that.

### V.

■ Our inquiry, however, does not end here. Only two of the six police officers, Cataldi and Kinsella, were named as defendants in these proceedings. The district court found that there was insufficient identification testimony to link these men to the affray. At the time the plaintiff rested, the sole testimony was that of Mr. McGraw who, describing the affray at the police station, stated:

> Then the two officers that were in the car when it happened they were standing there and one picked Mr. Howell and one had a wooden club and started banging on his shins, and this went on for it seemed like a long time, for a few minutes or so, until Mr. Howell stopped squirming.

This is the only time either Cataldi or Kinsella was linked to the beating. Clearly, without more, this evidence was insufficient to identify Cataldi and Kinsella as participants.

The next day, over objection, the court permitted plaintiff to reopen his case, at which time admissions from the pleadings were read into the record, viz., that Cataldi and Kinsella were police officers, that they answered the call to an automobile accident on the date, that plaintiff was involved in the accident, and that "an argument ensued between the answering defendants and the plaintiff. . . ." The defendants were the only police officers in the car, others arrived in a "paddy wagon." It can properly be said that a link was established connecting these defendants with Mr. McGraw's reference to "two officers that were in the car."

We then must decide whether the combination of the admission and the statement was sufficient to make out a *prima facie* case against either or both defendants. McGraw testified that "one picked Mr. Howell" and "one had a wooden club." The statement that one "picked Mr. Howell" is an extremely fragile reed upon which to impose liability. We have heretofore emphasized that it was necessary to prove that the conduct of the participants was intentional or purposeful. But prerequisite to a determination that one acted intentionally or purposefully is an ascertainment that the individual charged was the perpetrator of the constitutional deprivation. Mere presence of a person, when an assault and battery is committed by another, even though he mentally approves of it, but without encouragement of it by word or sign, is not sufficient of itself to charge him as a participator in the assault. 6 C.J.S. Assault and Battery § 27. Conceivably, use of the word "picked" in another context could have brought this actor within the orbit of liability, if, for example, there had been more than one prisoner involved in the affray. The act of "picking" the plaintiff, in the sense of choosing or selecting, could have thus been construed as encouraging by word or sign the assault by others. Where there is only one victim, however, and he was described as having been "picked," the

word in itself becomes achromatic and totally meaningless insofar as imputation of liability is concerned.[13] Insofar as the two defendants are concerned, one of them is free of liability. There was no proof, as to him, of intentional or purposeful conduct to inflict cruel and unusual punishment.

Thus, we do not have conduct rendering two or more actors liable. We are left with but one actor, in the words of witness McGraw, the "one [who] had a wooden club and [who] started banging" on Howell's shins.

There is no proof that Cataldi wielded the club or that Kinsella did; all that was said was that one of the two did. Reliance on 433 B of Restatement of Torts 2d[14] is therefore misplaced because explicit in this concept is proof of collective tortious conduct of *two* or more actors. At best, there was proof of wrongful conduct of *one,* identified only as one of two possible actors, without an explicit identification as to which of the two.

In Negrich v. Hohn, 379 F.2d 213, 215 (3d Cir. 1967), we dismissed a § 1983 complaint as insufficient because of "its failure to state facts in support of its conclusions. The charges of beatings and cruel and unusual punishment are made against the defendants generally and not against any particular defendant." Moreover, this court has been extremely cautious about imposing individual criminal liability where there are multiple actors in an assault and the identification testimony is ambiguous. In United States v. Barber (Appeal of Loper), 429 F.2d 1394, 1397 (3d Cir. 1970), Chief Judge Hastie stated, "Something of significance beyond the fact of presence is necessary to justify a conviction." Out of the same affray came an appeal by Brunswick to this court in United States v. Barber, 442 F. 2d 517, 523–524 (3d Cir. 1971), wherein we reversed his conviction because of the ambiguity generated by the use of the word "one" by an eye witness describing one of two F.B.I. agents who were victims of a mass assault:

> Although acquitted of the Grant assault [Count 1] and conspiracy counts, Brunswick was found guilty of assault upon Snyder [Count 2] and assisting the prisoner to escape. Catherine Wright testified that Brunswick was trying to get at the agent on the ground (Grant) "with his hand." She and Debbie Price also said that Brunswick participated in the assault upon agent Grant. The only testimony implicating Brunswick in the Snyder assault came from Miss Price: "There was a car there and there was one man against the car. And he [there?] was three boys and with each on him [and] he [they?] was holding his arms * * * Mowbray, Barber, and Brunswick were holding him * * * they were holding him and they had him stretched out * * * Barber was the one who was hitting him." Standing alone, this

13. Although reference has been made, by way of illustration, to but one meaning of the word, "picked," we are unable to conclude that any other dictionary meaning has the capability to support a *prima facie* case of participation. For example, there being no evidence of the presence of a pointed instrument or a sharp implement or object, there is no rational justification to interpret "pick": "1. To use a pointed instrument on; to pierce, indent, break up, pentrate, or the like, by striking with a pointed implement; as to pick a road with a pick ax; also, to make by picking; as to pick a hole." Webster's New International Dictionary, Second Edition, Un-

abridged. An attempt to assemble some relationship between the testimonial expression "picked" and a non-testimonial and non-evidentiary pointed instrument, implement, or object is to reach for a result devoid of evidentiary support.

14. § 433B. Burden of Proof

 * * * * *

 (3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

testimony would have generated a jury question on the Snyder assault count. When considered with other testimony, however, including that of Miss Price, that Brunswick played an active role assaulting agent Grant at about the same time the assault on agent Snyder was being perpetrated, this fragment of testimony, that Brunswick was "holding" "one man against the car," cannot, without a more specific identification of the "one man," be considered sufficient to sustain a conviction on Count 2.

Recognizing that our analogy has been directed to criminal cases where identification must be proved beyond a reasonable doubt as contrasted with civil cases where the proof need only rise to a preponderance of the evidence, we hold that here plaintiff failed to meet his burden. Accordingly, we conclude that the district court did not err when it directed a verdict in favor of Cataldi and Kinsella because of plaintiff's failure to make an appropriate identification.

The judgment of the district court will be affirmed.

VAN DUSEN, Circuit Judge (dissenting):

I respectfully dissent from the conclusion of the majority (Part V, page 282 ff. of majority opinion) that the plaintiff failed to meet his burden of proving that defendants Cataldi and Kinsella denied plaintiff his civil rights through inflicting cruel and unusual punishment upon him. As I read the record of the trial, the following evidence required the district court to deny the motion for a directed verdict at the end of plaintiff's case.[1]

The eyewitness testified that two officers entered the police station with plaintiff "and they walked him up to the counter and then the one officer took his hands behind Mr. Howell's head and smashed it into the counter" (N. T. 45). Plaintiff pushed back from the counter and the two officers then threw him to the floor and hit him with their fists and a blackjack (N. T. 46). At this point, as noted at page 282 of the majority opinion, defendants Cataldi and Kinsella, whom the jury could have found "were the two officers in the car when it happened," were referred to as participants in the assault.[2] All four of the officers then held plaintiff down. Later plaintiff was picked up from the floor and pushed over on the counter, when they took off his handcuffs. He was again hit and knocked down. The eyewitness then testified that plaintiff was assaulted by the four policemen (two of whom were Cataldi and Kinsella, being the two officers "in the car when it happened") and two additional officers, using this language:

"They were hitting him with the clubs and the blackjacks and they

---

1. See Raritan Trucking Corporation v. Aero Commander, Inc. et al., 458 F.2d 1106 (3d Cir. 1972), stating that the evidence must be considered in the light most favorable to plaintiff.

2. The transcript reads:
 "Then the two officers that were in the car when it happened they were standing there and one picked Mr. Howell and one had a wooden club and started banging on his shins, and this went on for it seemed like a long time, for a few minutes or so, until Mr. Howell stopped squirming."
 Although the first dictionary meaning of the verb "pick" includes an assault with a pointed object, as noted in footnote 13 of the majority opinion, it seems more sensible to remand the case for determination of whether the notes of testimony do not indicate that "kicked" was the word used by the witness, in view of this language appearing at page 14 of the deposition of the eyewitness (Document 9 in district court file):
 "So the cops grabbed each foot and then used these wooden clubs. One was hitting him on the shins with a wooden club, one was hitting him on the shoulders with a blackjack, and one was *kicking* him in the ribs, and one was just hitting him with his hands.
 "Q. While he was on the floor?
 "A. Right. They were holding him down. There were 4 of them holding him, . . . ." (Emphasis supplied.)

were kicking him. His arms were bleeding, his pants were ripped where his legs were bleeding from both shins, and then he squirmed a little more this time so two officers jumped over the counter from out front. That made six, and they *all* jumped on him until he stopped squirming, and then they lifted him up and took him into the cell block, but that lasted longer the second time than it did the first time." (Emphasis supplied.)

Since "all" six officers participated in this assault, the defendants Cataldi and Kinsella must have taken part in it also.

Under these circumstances, the following principle contained in § 433B(3), Restatement of Torts 2d, and the totality of the evidence shifted the burden of proof to the defendants to go forward with evidence at the close of plaintiff's case, since the jury was entitled to accept the above evidence:

"(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

\* \* \* \* \* \*

"Comment on Subsection (3):

"f. . . . It arises where the conduct of two or more actors has been proved to be negligent or otherwise tortious, and it is also proved that the harm to the plaintiff has been caused by the conduct of only one of them, but there is uncertainty as to which one. In such a case the burden is upon each actor to prove that he did not cause the harm. As in the case of Subsection (2) the reason for the exception is the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.

"g. The rules stated in Subsection (3) applies only where it is proved that each of two or more actors has acted tortiously, and that the harm has resulted from the conduct of some one of them."

In my view, the above evidence is sufficient to permit the jury to find that each of the above-named defendants assaulted plaintiff, inflicting cruel and unusual punishment on him. I would reverse and remand for a new trial.