**Michael LYONS et al., Plaintiffs,**

v.

**John J. GILLIGAN, Individually and in his capacity as Governor of the State of Ohio, et al., Defendants.**

**Civ. A. No. C 74-271.**

United States District Court, N. D. Ohio, E. D.

Sept. 9, 1974.

Ovid C. Lewis, University Heights, Ohio, for plaintiffs.

Richard B. Igo, Asst. Atty. Gen., Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiffs, two inmates of the Marion Correctional Institution of Marion, Ohio, and their wives, bring this action under 42 U.S.C. § 1983 (1970) against various state officials on the theory that the absence of the opportunity for conjugal visits at the institution denies the plaintiffs their constitutional right of privacy and constitutes cruel and unusual punishment. Defendants move to dismiss the complaint pursuant to Rule 12(b), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. The truth of the facts hereafter set forth is accepted as alleged in the complaint for purposes of considering defendants' motion.

Since October, 1972 plaintiff Michael Lyons has been serving a one- to seven-year sentence for stealing auto parts; plaintiff Donald Richards began a five-to 30-year sentence following a conviction for burglary and larceny in March, 1973. Both were married while they were inmates in the Cuyahoga County Jail. They allege that before their commitment to county jail they had been living with their prospective spouses, and each couple had held itself out to the community as man and wife. During that time both couples "engaged regularly in sexual intercourse" and, their complaint continues, they "felt that sex and private displays of affection for one another were an important part of their relationship and marriage." The rules of the Marion Correctional Institution "completely prohibit any acts of sexual intimacy between inmates and their visitors." Plaintiffs allege and defendants have not denied that no facilities exist for either of the two couples to engage in acts of sexual intimacy. Proceeding from these facts the plaintiffs say in substance that the denial of conjugal visits causes constitutional deprivation of their claimed right of marital privacy and intimacy and the imposition of cruel and unusual punishment.

Plaintiffs contend at the outset that this case is governed by the rule that a motion to dismiss pursuant to Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Because these claims turn on constitutional considerations that may be fully tested in light of the facts alleged in the complaint and accepted as true for the purpose of considering the defendants' motion to dismiss, it is concluded that this case does not fall within that rule.

### I.

Elaborating their first claim, plaintiffs say:

[T]he right to engage in sexual relations with one's lawfully-wedded spouse, free from intrusion or regulation by the State, is part of the fundamental right of privacy guaranteed to all persons by the Constitution of the United States.

They then allege that defendants abridge this fundamental right

. . . by formulating rules denying Plaintiffs their right to engage in sexual relations with their respective

spouses, and by failing to provide facilities which would allow Plaintiffs to engage in sexual relations with their respective spouses . . ..

■■ Having presumed this "fundamental right of privacy," plaintiffs urge that this right may not be denied prisoners unless that denial is necessitated by the fact of incarceration and the state can show a compelling interest for denying the right as well as the absence of less onerous means of effectuating that interest. Necessarily a prerequisite to these contentions is establishment of the claimed fundamental right of privacy. But this requires a long leap beyond the present concept of the privacy right guaranteed by the Constitution. The right of marital privacy was first recognized by the Supreme Court when it held in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) that a statute forbidding the use of contraceptives violates the right of marital privacy guaranteed by the Bill of Rights. The Court's concern was that a prohibition on the use of contraceptives necessarily anticipated searches of marital bedrooms for proof, and it concluded, "The very idea is repulsive to the notions of privacy surrounding the marriage relationship." *Griswold, supra* at 485–486, 85 S.Ct. at 1682. *Cf.* Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In an attempt to establish that *Griswold* has a broad reach, plaintiffs point out that since that case the Indiana sodomy statute has been declared inapplicable to married couples, to protect marital relations "from regulation by the state through the use of a criminal penalty."

Cotner v. Henry, 394 F.2d 873, 875 (7 Cir. 1968), cert. den. 393 U.S. 847, 89 S.Ct. 132, 21 L.Ed.2d 118 (1969). Again, police enforcement of such a statute would require intrusion into the intimacies of the marital relationship. *Cotner* has not been extended. In Lovisi v. Slayton, 363 F.Supp. 620 (E.D.Va. 1973) a district court concluded that the sodomy statute is enforceable where a married couple has relinquished its privacy. Thus, that court also recognized that the right of privacy on which plaintiffs rely is bottomed on the need to ensure private citizens that the police will not intrude upon their most intimate affairs. It does not follow, however, that because the state cannot pass criminal laws the enforcement of which will require such intrusion, the state is obligated by the Constitution to create private places for the conduct of marital relations. The nub of *Griswold* was restraint on governmental intrusion. It cannot be extended to impose an affirmative duty on the government. Moreover, imprisonment of persons convicted of crimes is not tantamount to an intrusion into the prisoner's home. Thus it is concluded and determined that the plaintiffs' constitutional right of privacy is not being infringed by the absence of facilities for conjugal visits or by prison rules prohibiting acts of sexual intimacy between prisoners and their wives during visits. *Cf.* Gittlemacker v. Prasse, 428 F.2d 1 (3 Cir. 1970).[1]

## II.

Plaintiffs contend that the deprivation of conjugal visits is causing great physical and psychological stress to them and is "endanger[ing] the stability and the very existence of Plaintiffs' marriages."

1. Because of the finding that plaintiffs have not been denied a fundamental right, it is unnecessary to reach the question of what test should be applied to determine whether the denial of a right by a prison is justified and constitutional. However, it should be pointed out that the plaintiffs' test, that the denial be necessarily inherent in incarceration and that the state show a compelling interest and "that no less onerous alternative exists to effectuate that interest," would not necessarily be applied by this court. A recent statement by the Supreme Court suggests that a less stringent test would be in order: "[T]here must be *mutual accommodation* between institutional needs and objectives and the provisions of the Constitution that are of general application." Wolff v. McDonnell, 418 U.S. 539, at 556, 94 S.Ct. 2963, at 2975, 41 L.Ed.2d 935 (1974). [Emphasis supplied.]

They assert that these results

are beyond the purview of acceptable punishments which the state may impose upon Plaintiffs Michael Lyons and Donald Richards.

The wives, because of the deprivation of sexual relations with their husbands, are allegedly being punished "equally with their husbands although [they] have not been adjudged guilty of any crime or offense against the State of Ohio." Hence it is asserted that the deprivation of conjugal visits "amounts to the imposition of cruel and unusual punishment upon the several Plaintiffs."

■■ It is true that Harlena Lyons and LaQuita Richards in effect are penalized by their husbands' incarceration without having themselves been convicted of a crime. But the Eighth Amendment prohibition does not reach so far as to require the state to ensure against hardships caused to third persons as a result of the incarceration of one convicted of a crime. Accordingly, if an Eighth Amendment violation were found here, the rights affected would only be those of plaintiffs Michael Lyons and Donald Richards.

There is no ready formula for determining what treatment constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Trop v. Dulles, 356 U.S. 86, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion); see Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (memorandum opinion and nine separate opinions). The Supreme Court guidelines on the Eighth Amendment are few: For example, the death penalty as applied in particular cases violates the Eighth Amendment. *Furman, supra.* Punishment is cruel and unusual if it is inflicted pursuant to a law that makes a crime of the illness of narcotic addiction. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758

(1962). Denationalization as a punishment is barred by the Eighth Amendment, for it is "the total destruction of the individual's status in society" and places his "very existence . . . at the sufferance of the country in which he happens to find himself." Trop v. Dulles, *supra* (plurality opinion). Finally, the severe and excessive punishment of bearing a chain night and day and being forced to do painful and hard labor for 12 years for falsifying public records violates the Eighth Amendment. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

■ Without attempting to summarize all the Supreme Court's applications of the Eighth Amendment, it may be said for purposes of this case that punishment must be meted out only for crimes committed, must comport with human dignity, and must not be excessively severe in itself or in relation to the crime. The Court has noted, in addition, that the concept of acceptable punishment is not static, but "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop, supra,* 356 U.S. at 101, 78 S.Ct. at 598 (plurality opinion).

■■ The absence of conjugal visiting in prisons is not excessive punishment in itself or disproportional to plaintiffs' crimes. It is merely a customary concomitant of the punishment of incarceration. Plaintiffs allege that they are suffering physical stress; yet less than ideal physical conditions characterize prisons: for example, institutionalized diets, confining cells, limited exercise, lack of quiet. They also allege they have suffered psychological stress. But psychological stress, like loneliness, boredom, wasted time, and the other wages of incarceration, do not in fact and therefore cannot in law constitute cruel and unusual punishment.[2] By a

---

2. Examples exist of other prison practices that must also cause mental stress, yet have been held not to be cruel and unusual. *E.* *g.,* Johnson v. Rockefeller, 365 F.Supp. 377 (S.D.N.Y.1973) (prisoners denied marriage ceremony); Pinkston v. Bensinger, 359 F.

parity of reasoning, a denial of conjugal visits does not constitutionally destroy or impair an inmate's human dignity.[3]

### III.

Trop v. Dulles, *supra* declares

The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

356 U.S. at 101, 78 S.Ct. at 598 (plurality opinion). This instruction makes it essential to inquire into the fact noted in plaintiffs' brief that a number of foreign countries and "several states, including Mississippi and California, allow prisoners to have conjugal visits with their wives."

In 1968 California began its system of prisoner family visits at California Correctional Institution at Tehachapi, a treatment-oriented institution.[4] In 1971 the program was extended to maximum security prisoners with its introduction into Soledad, San Quentin, and the rehabilitation center at Corona.[5] The conjugal visits program in California is actually only a part of the family visiting program.[6] It allows inmates to spend three days a month with their families in apartments outside but close to the prison walls. Eligibility is limited, however, to men who have earned parole consideration and have had six months of good conduct in the institution.[7] At the Mississippi State Penitentiary conjugal visits are permitted on the prison grounds during weekly visiting hours. Formerly the Parchman plantation, the penitentiary is a prison farm now called "Parchman." Prisoners are organized in camps of up to 200 prisoners. Each camp has a small house erected by the prisoners in their spare time and used for wives' visits. The whole family is encouraged to visit the prisoners and the small-camp arrangement makes it possible to have both family visits and marital intimacy with a minimum of administrative difficulty and embarrassment. The family visiting program also includes the possibility of furloughs.

---

Supp. 95 (N.D.Ill.1973) (lack of privacy during visits to inmates in solitary confinement).

Other courts have likewise found the failure to provide for marital relations in prison not to be a violation of the Eighth or Fourteenth Amendments. In Stuart v. Heard, 359 F.Supp. 921 (S.D.Tex.1973) the court held that segregating prisoners by sex and not providing facilities for marital visits did not constitute cruel and unusual punishment. *Stuart* cities and relies on Tarlton v. Clark, 441 F.2d 384 (5 Cir.), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971), where in a mandamus action the court held that the United States Bureau of Prisons had not denied the plaintiff his Eighth Amendment rights in not allowing him to have sexual relations with his wife during her visit. The same result was reached in Brown v. Gillman, No. 73–80–2 (S.D.Iowa, March 30, 1973) (unreported), and Payne v. District of Columbia, 102 U.S.App.D.C. 345, 253 F.2d 867 (1958).

3. It may be, in fact, that a greater risk of loss of dignity inheres in imposing a scheme of conjugal visits than in the withholding of those visits. Sol Chaneles in The Open Prison (1973) at 121–22, reports that when the New York State legislature began hearings on the question whether to provide for conjugal visits, it received many letters in opposition from inmates' wives. They believed such visits would be "personally humiliating" and would "grossly [demean] the emotional aspects of sexual expression." See also Balogh, Conjugal Visitation in Prisons: A Sociological Perspective, 28 Federal Probation 52, 56–57 (1964).

4. *Time*, Aug. 9, 1968, at 68.

5. *Life*, Aug. 13, 1971, at 25.

6. Hayner, Attitudes Toward Conjugal Visits for Prisoners, 36 Fed. Probation 43, 48 (1972).

7. Id.

However, maximum security prisoners are not allowed to have conjugal visits.[8]

These brief descriptions show that California grants conjugal visiting only with strict eligibility requirements. As for Mississippi, it excludes maximum security prisoners, and the physical facility at Parchman is especially amenable to such visits. Apparently experiments in New Jersey, Texas, and North Carolina have also been undertaken in recent years, but again, only for a select group of prisoners.[9]

New approaches to family visiting incorporating conjugal visiting are being taken in an increasing number of state prisons in our nation. While this trend is one of the indicators of whether "evolving standards of decency" have yet made deprivation of conjugal visiting a constitutional violation, this evolving reform in penological practices is not translatable into a constitutional right.

As this state studies the progress of family visiting including conjugal visiting at some penal institutions in California, Mississippi, and other states, Ohio may decide similarly to expand its program of family visiting at some of its correctional institutions. Nonetheless, as this court understands the constitutional rights of marital privacy and the Eighth Amendment's prohibition against cruel and unusual punishment, neither of these federal constitutional rights compels Ohio or any other state to grant conjugal visiting to its penal inmates and their spouses.

Upon the entire record, and for the foregoing reasons, the defendants' motion to dismiss the complaint is granted.

It is so ordered.

8. Hopper, The Conjugal Visit, The Soc. of Punishment & Correction (1970), reprinted from 53 J.Crim.L.C. & P.S. 340–43 (1962). Only one house, that at the first offenders' camp, was built by official plan. The others were done over the years at the prisoners' initiative with administrative concurrence. Id.

9. Sol Chaneles, The Open Prison, 121–22 (1973). The selectivity of family visiting

programs has been criticized. See Johns, Alternatives to Conjugal Visiting, 35 Fed. Probation 48, 49–50 (1971).

For a discussion of conjugal visiting practices in foreign countries based on a 1958 study, see Cavan & Zemans, Marital Relationships of Prisoners in Twenty-Eight Countries, 49 J.Crim.L.C. & P.S. 133 (1958).