IMPRISONED CITIZENS UNION et al.

v.

Milton SHAPP et al.

Civ. A. Nos. 70–3054, 71–513, 71–1006, 70–2545 and 72–2060.

United States District Court,
E. D. Pennsylvania.

June 7, 1978.

894

Jack J. Levine, Alan B. Rubenstein, Philadelphia, Pa., for plaintiffs.

Benjamin Lerner, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiffs, twenty-one individual prisoners and an unincorporated association of prisoners of the Commonwealth of Pennsylvania incarcerated at six state penitentiaries, brought this class action in 1970.[1] Plaintiffs represent a class comprising all persons who are now or will be incarcerated in the Pennsylvania State Correctional Institutions at Graterford, Dallas, Huntingdon, Muncy, Rockview and Pittsburgh. Defendants are elected and appointed officials of the Commonwealth and its prison system. The complaint attacks conditions and policies at each of the prisons as being violative of 42 U.S.C. §§ 1982, 1983, and 1988 as well as the First, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. We have jurisdiction under 28 U.S.C. § 1343.

Most of the issues raised in the complaint are the subject matter of a consent decree entered into by the parties and approved by me on May 22, 1978. However, two areas of contention were omitted from settlement and instead have been litigated. These complaints involve the constitutionality of conditions in the maximum security cell blocks at four state penitentiaries and of the prohibition in all the institutions against conjugal visits. We visited the four cell blocks in question in August 1974 and again in August 1975. We reserved ruling on these two issues, pending our decision to approve the consent decree.

We conclude that the conditions in the maximum security areas at Graterford, Dallas and Muncy do not constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. However, the three cells at Huntingdon known as the "Glass Cage" are constitutionally unacceptable and must be closed. We also conclude that the prohibition against sexual visitation at each of the state institutions does not offend the Constitution.

---

1. Several other suits brought by state prisoners have been consolidated with this original action (C.A. # 70–3054) and have been resolved by the Consent Decree or tried in this adjudication.

In determining the constitutionality of prison conditions, federal courts must allow state penal officials broad latitude in determining how to administer and regulate the prison environment in light of recognized penological goals of deterrence, rehabilitation and institutional security. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–126, 97 S.Ct. 2532, 2538–2539, 53 L.Ed.2d 629, 638–39 (1977); *Pell v. Procunier*, 417 U.S. 817, 822–26, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The court cannot dictate to state officials the conditions which the court may feel, as a matter of enlightened and advanced prison theory, should prevail in state penitentiaries. *See Knuckles v. Prasse*, 302 F.Supp. 1036, 1048 (E.D.Pa.1969), *aff'd*, 435 F.2d 1255 (3d Cir. 1970), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971). However, "judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims," *Procunier v. Martinez*, 416 U.S. at 405, 94 S.Ct. at 1807, and therefore the court should not hesitate to remedy conditions which amount to cruel and unusual punishment.

The Eighth Amendment defies precise definition because it "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). In the context of prison conditions there are three criteria of the Eighth Amendment which might be applied. If an inmate can demonstrate that penal conditions violate any one of these tests, the condition must be invalidated.

The first criterion is the classic standard that penal conditions are proscribed which violate "the dignity of man", *Trop v. Dulles*, 356 U.S. at 100, 78 S.Ct. 590; *Howell v. Cataldi*, 464 F.2d 272, 280 (3d Cir. 1972), that is conditions which are "so barbarous that [they offend] society's evolving sense of decency", *Nadeau v. Helgemoe*, 561 F.2d 411, 413 (1st Cir. 1977), which involve "physical and mental abuse or corporal pun-ishment of such base, inhumane, and barbaric proportions so as to shock and offend a court's sensibilities," *Burns v. Swenson*, 430 F.2d 771, 778 (8th Cir. 1970), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972), or which involve "unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

The second criterion is that punishment which is grossly disproportionate to the offense which precipitated that sanction is violative of the Eighth Amendment. *Weems v. United States*, 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910). This test has been applied in challenges to the type of punishment imposed, *Gregg v. Georgia*, 428 U.S. 153, 173, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (death penalty); *Trop v. Dulles*, 356 U.S. at 100, 78 S.Ct. 590 (denationalization); and to the duration or conditions of punishment, *Downey v. Perini*, 518 F.2d 1288, 1290 (6th Cir.), *vacated*, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974) (duration of solitary confinement); *Hart v. Coiner*, 483 F.2d 136, 139–43 (4th Cir. 1973), *cert. denied*, 415 U.S. 938, 94 S.Ct. 1454, 39 L.Ed.2d 495, *rehearing denied*, 416 U.S. 916, 94 S.Ct. 1624, 40 L.Ed.2d 118 (1974); *LaReau v. MacDougall*, 473 F.2d 974, 978 n. 6 (2d Cir. 1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973) (strip cell grossly severe for prison infraction).

The third criterion of the Eighth Amendment has evolved in more recent decisions and requires that punishment must not go beyond legitimate penal objectives, *i. e.*, the punishment must bear a rational relationship to the accomplishment of penological goals which are of sufficient importance to justify its severity. *See Owens-El v. Robinson*, 442 F.Supp. 1368, 1384–85 (W.D.Pa.1978); *Inmates, D. C. Jail v. Jackson*, 416 F.Supp. 119, 122 (D.D.C.1976); *Padgett v. Stein*, 406 F.Supp. 287, 293 (M.D. Pa.1975); *Jordan v. Fitzharris*, 257 F.Supp. 674, 679 (N.D.Cal.1966). The Third Circuit has adopted an analogous position in *Howell v. Cataldi*, 464 F.2d 272 (3d Cir. 1972), in which the court stated:

"A punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used." *Id.* at 281, *quoting from Jordan v. Fitzharris,* 257 F.Supp. at 679.

At least five members of the Supreme Court recently have accepted the "penological objectives" criterion. In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Justice Stewart stated in a plurality opinion joined by Justices Powell and Stevens that in order to satisfy the Eighth Amendment "the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Id.* at 183, 96 S.Ct. at 2929. Justices Brennan and Marshall similarly have approved the penological objectives standard in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See* 408 U.S. at 279–80, 92 S.Ct. 2726 (Brennan, J., concurring); 408 U.S. at 331–33, 92 S.Ct. 2726 (Marshall, J., concurring). This test has been applied to a denial of medical treatment in *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, where the Court said, "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."

*I. Solitary Confinement.*

■ Eighth Amendment challenges to the conditions of solitary confinement frequently have been made. It is clear that such confinement is not *per se* violative of the Eighth Amendment. *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197, 1202 (3d Cir. 1973). However, confinement in which the isolation cells provided inadequate space, heating, ventilation, lighting or sanitary conditions or where the inmates received inadequate items of personal hygiene, food or clothing, has been declared to be cruel and unusual punishment. *See, e. g., LaReau v. MacDougall,* 473 F.2d at 978 (dark cell, inadequate sanitary conditions); *Wright v. McMann,* 387 F.2d 519, 526 (2d

Cir. 1967) (inadequate clothing, heating and implements of personal hygiene); *Owens-El v. Robinson,* 442 F.Supp. at 1384 (inadequate bedding, clothing and toilet articles); *Pugh v. Locke,* 406 F.Supp. 318, 327 (M.D. Ala.1976), *aff'd,* 559 F.2d 283 (5th Cir. 1977) (filth, overcrowding, inadequate food and exercise); *Battle v. Anderson,* 376 F.Supp. 402, 424 (E.D.Okl.1974), *aff'd,* 564 F.2d 388 (10th Cir. 1977) (long-term idleness, inadequate exercise, work or educational programs). Where the challenge is made to the conditions of solitary confinement, rather than to the criteria for assignment to segregation or the length of such confinement, the first and third criteria of the Eighth Amendment are the relevant standards to judge the constitutional claims made here. With these two tests and the case law previously cited in mind, we will examine the conditions at each of the institutions under consideration.

*A. State Correctional Institution at Graterford.*

■ The maximum security cell block at Graterford Prison is known as the Behavior Adjustment Unit ("BAU"). It consists of thirty-nine cells in a U-shaped building located approximately five hundred to six hundred feet from the main building complex. Each cell in the BAU is approximately six feet wide, ten feet deep, and eight feet high, and is furnished with a bed, mattress, a sink and hopper combination (controlled by the inmate), sheets, and a pillow. Only cold water is provided. The cells are windowless and have no interior lighting. However, there are windows across the corridor from the cells as well as 150-watt light bulbs in front of the cells which illuminate the cells sufficiently for inmates to read. The cells are clean and have no unpleasant odors. Ventilation is adequate.

Inmates confined to the BAU have the same right to receive mail, legal materials, and publications as do those in general population. They receive three showers a week and one hour of exercise a day. A doctor visits the BAU each day and a psychiatrist

is available at an inmate's request. Inmates in the BAU receive the same food as inmates in general population although occasionally in reduced portions.

Inmates are committed to the BAU by self-commitment, as transfers from other institutions' BAU's, or after a due-process hearing on charges of misconduct. Commitments to the BAU generally do not exceed thirty days, but there are some long-term assignments.

"Death row" cells consist of nine cells within the BAU. They are exactly like the other BAU cells except that they have hot and cold water.

We conclude, based on the record at trial and our two visits, that use of the BAU at Graterford does not constitute cruel and unusual punishment. There is no question that the cells in the BAU are grim and cheerless. Nonetheless, we conclude that these conditions are not so inhumane or base that they shock the court's conscience or violate standards of human decency. Similarly, we find that such confinement is rationally related to legitimate penal goals and thus meets constitutional standards.

### B. State Correctional Institution at Dallas.

 The maximum security cell block at Dallas consists of two levels: the ground level block, known as S–1, and a lower level, known as the "Annex". S–1 comprises eighteen cells; the Annex contains eleven cells.

The S–1 cells have a separate toilet and sink, a bed, and a light inside the cell. An inmate is confined to S–1 only after a hearing. Every seven days the inmate's confinement is reviewed by his counselor. Every thirty days a committee reviews the inmate's confinement with the inmate present.

In general, an inmate is sent to the Annex from S–1. Confinement there generally averages from one to four days, although in some cases assignment to the Annex has exceeded thirty days.

The cells in the Annex measure approximately five feet wide by nine feet deep by ten feet high. They have neither windows nor lights, but windows across from the cells and lights in the corridor provide sufficient lighting for inmates to read. Ventilation is adequate. The cell block is clean and free from unpleasant odors. Inmates are generally allowed daily showers and are visited by a doctor each day. Inmates are generally, but not always, served full rations of food. Daily exercise of up to two hours is allowed in the corridor outside the cell except when the inmate is disruptive.

As with the BAU at Graterford, we must conclude that confinement in the S–1 and Annex cells at Dallas, although certainly unpleasant, does not amount to cruel and unusual punishment.

### C. State Correctional Institution at Muncy.

 The State Correctional Institution at Muncy, a women's prison, is an open institution; it has no walls, fences, or perimeter guards. The administrative and punitive segregation units of Muncy are housed in Clinton Cottage, which is located in a wooded area one-half mile from the main facilities. Clinton Cottage contains forty-eight cells on two floors. The first floor contains nineteen cells, fourteen with single wooden doors used for administrative segregation and four with double doors (one wooden, one barred) used for punitive segregation. The second floor consists of twenty-nine cells, fourteen of which are double-doored and are used for punitive segregation. The remaining second-floor cells are no longer used.

Each cell is approximately twelve feet deep by eight feet wide by nine feet high and contains a bed, night table, toilet, and sink. The lighting in the cell consists of a sixty-watt bulb. Except for inmates housed in the first-floor punitive segregation cells, inmates in Clinton Cottage are allowed all items in their cell permitted inmates in the general population. Food portions are not reduced. Three showers are permitted each week. Clinton Cottage is clean and well-ventilated with no unpleasant odors.

898

Inmates in administrative segregation are allowed out of their cells for one-half of the day. However, those confined to punitive segregation are not allowed out at all. Inmates in punitive segregation are confined generally for from one to two weeks, with weekly review, although some inmates are kept for considerably longer periods.

We have no difficulty in concluding that conditions at Clinton Cottage, even for those inmates in punitive segregation, do not constitute cruel and unusual punishment.

## D. State Correctional Institution at Huntingdon.

█ The maximum security area at Huntingdon contains 144 cells. The psychiatric quarters consist of seventeen cells. Three of these cells are known as the "Glass Cage" and provide the focus of the Huntingdon inmates' constitutional attack. We conclude that use of the Glass Cage constitutes treatment so inhumane and degrading as to amount to cruel and unusual punishment. Its continued use cannot be tolerated.

The Glass Cage is enclosed by glass walls and a locked steel door. The cells measure approximately nine feet deep by eight feet wide by nine feet high. There is no furniture, no window, and no inside lighting. Cells are equipped with a toilet and sink and are supposed to include a mattress, two sheets, a pillow, and blankets. We saw none of these items during our visits, but the cells were not in use at that time. Outside lighting is totally inadequate for reading. In addition, despite use of a large fan, ventilation is insufficient. The cells are unclean and an unpleasant odor pervades.

Our conclusion that the cells in the Glass Cage cannot remain in use is based in large part on our two visits to the institution. On each occasion we were genuinely shocked by the dark, dirty, and totally isolated conditions we observed. We agree with plaintiffs that the continued existence of the Glass Cage constitutes a serious threat to the physical and mental well-being of every resident who is confined there, and thus we conclude that confinement in such conditions could serve no legitimate penological purpose.

## II. Conjugal Visits.

█ Plaintiffs urge us to declare that the lack of facilities at each institution in which inmates may enjoy sexual visitation with their spouses constitutes cruel and unusual punishment. In support of this claim, plaintiffs presented an expert witness, Dr. Herbert Thomas, who testified that lack of conjugal visits is a factor which can cause an inmate to suffer physical, emotional, and psychological stress. The psychological regression which may result can lead to homosexual behavior, violence, loss of self-identity, and self-destructive behavior.

Plaintiffs concede that there is no inherent constitutional right to engage in heterosexual relations in prison. However, they argue that the Eighth Amendment protects them from the deleterious effects which flow from denial of sexual visitation rights. They distinguish cases which have held that denial of conjugal visits does not constitute cruel and unusual punishment, see, e. g., McCray v. Sullivan, 509 F.2d 1332, 1334 (5th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); Lyons v. Gilligan, 382 F.Supp. 198, 201–03 (N.D.Ohio 1974), by noting that the records in those cases lacked the expert testimony provided by plaintiffs.

We do not believe that Dr. Thomas' testimony justifies a departure from those decisions upholding the denial of sexual visitation against constitutional attack. See United States ex rel. Wolfish v. Levi, 439 F.Supp. 114, 142–43 (S.D.N.Y.1977), aff'd 573 F.2d 118 (2 Cir.1978) (and cases cited therein). Dr. Thomas testified that psychological regression in inmates results from many factors. Foremost among these causes, according to Dr. Thomas, is not denial of sexual visitation, but instead, lengthy sentences resulting in long terms of incarceration. Consequently, we find that the denial of sexual visitation itself does not cause severe mental or physical deterioration.

It is clear that not all conditions of confinement which have an adverse effect on a prisoner are constitutionally proscribed. In *Pell v. Procunier*, 417 U.S. at 822–23, 94 S.Ct. 2800, the Court stated that one of the essential functions of incarceration is the isolation of the inmate from society, which is intended to be an undesirable condition so as to deter potential criminals from committing crimes.

The restriction challenged here and its effects on inmates do not violate any of the three Eighth Amendment criteria. See Part I, *supra.* It is obvious that the first two tests of unconstitutionality have not been met. The essence of penal confinement is isolation from society, including limitations on physical and social interactions. We conclude that the prohibition on sexual visitation is not so inhuman that it shocks the conscience and that it is not disproportionate punishment. A closer question is whether such a restriction is rationally related to a legitimate penological goal. We agree with Judge Frankel's opinion in *United States ex rel. Wolfish v. Levi*, 439 F.Supp. at 143, that there is a division of penological opinion on the advisability of conjugal visitation and that the judiciary is ill-equipped to resolve this complex policy question. However, since there is ample support for the proposition that a restriction on sexual visitation is rationally related to legitimate penal concerns for institutional security and the deterrence value of incarceration, I conclude that such a prohibition must be sustained under the Eighth Amendment.