**IMPRISONED CITIZENS UNION et al.**

v.

**Milton SHAPP et al.**

**Civ. A. No. 70–3054.**

United States District Court,
E. D. Pennsylvania.

Nov. 20, 1978.

John T. Snavely, II, Philadelphia, Pa., for plaintiffs.

J. Andrew Smyser, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

In an order entered May 30, 1978 we enjoined on Eighth Amendment grounds the continued use of three maximum security cells, known as the "Glass Cage", at the State Correctional Institution at Huntingdon, Pennsylvania. *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. 893, 898 (E.D. Pa.1978). Defendants, alleging that the constitutional defects in the Glass Cage have been cured, moved on June 7 under Rule 59 of the Federal Rules of Civil Procedure for relief from our judgment. We are thus again asked to consider the mercurial concept of cruel and unusual punishment.

## I. THE INJUNCTION:

In our June 7 opinion we described the three isolation cells at Huntingdon as follows:

> "The Glass Cage is enclosed by glass walls and a locked steel door. The cells measure approximately 9′ deep by 8′ wide by 9′ high. There is no furniture, no window, and no inside lighting. Cells are equipped with a toilet and sink and are supposed to include a mattress, two sheets, a pillow, and blankets. We saw none of these items during our visits, but the cells were not in use at that time. Outside lighting is totally inadequate for reading. In addition, despite use of a large fan, ventilation is insufficient. The cells are unclean and an unpleasant odor pervades." 451 F.Supp. at 898.

These observations were made during tours of the maximum security area taken in August 1974 and one year later in August 1975. The injunction against continued use of the three psychiatric cells was anchored in our visceral impressions:

> "Our conclusion that the cells in the Glass Cage cannot remain in use is based in large part on our two visits to the institution. On each occasion we were genuinely shocked by the dark, dirty, and totally isolated conditions we observed. We agree with plaintiffs that the continued existence of the Glass Cage constitutes a serious threat to the physical and mental well-being of every resident who is confined there, and thus we conclude that confinement in such conditions could serve no legitimate penological purpose." *Id.*

Defendants now argue that because of improvements in the Glass Cage since our last visit over three years ago, conditions are no longer shocking and use of the cells no longer illegitimate.

## II. DEFENDANTS' MOTION: Rule 59(a) or 60(b)?

Defendants have styled their request that the injunction be lifted as a motion for "new trial or amendment of judgment under Rule 59 of the Federal Rules of Civil

Procedure."[1]  We doubt that a 59(a)(2) motion is the proper procedural vehicle for bringing defendants' argument before us. Professor Moore, discussing Rule 59(a)(2), writes that "[a]s a practical matter, in equity formerly and in court actions now, three grounds for new trial are most commonly known: for manifest error of law or fact, and for newly discovered evidence." 6A *Moore's Federal Practice*, ¶ 59.07 at 59–94—59–95 (2d ed. 1974) (footnotes omitted). Neither manifest error of fact nor of law has been or can be urged by defendants. The "newly discovered evidence" ground is likewise untenable here.  "To constitute newly discovered evidence for which a new trial may be granted under Rule 59, the evidence must pertain to *facts in existence at the time of the trial*, and not to facts that have occurred subsequently." *Id.* at 59–115 (emphasis added) (footnote omitted). According to the testimony of Lowell Hewitt, Superintendent of the Huntingdon facility, the improvements cited by defendants were largely accomplished in late 1977, well after our trial of the issue and therefore cannot be the basis of a motion for a new trial or amendment of judgment. It appears, then, that none of the 59(a)(2) grounds for relief is present here.

■ Defendants' motion seems more properly within the scope of Rule 60(b)(5) than Rule 59(a)(2).· Rule 60(b)(5) provides *inter alia* that "[o]n motion and upon such terms as are just, the court may relieve a party  .  .  .  from a final judgment, order or proceeding [if] it is no longer equitable that the judgment should have prospective application."  This, we think, is the logical foundation for defendants' request and the parties tacitly agree, both sides having identified the "key question" as whether it is now "inequitable" to give our May 30th order "prospective application." Memorandum of Law in Support of Plain-

tiffs' Answer to Defendants' Motion for New Trial at 2;  Reply to Plaintiffs' Answer to Defendants' Motion at 2.  Because the parties have treated defendants' motion as a Rule 60(b)(5) issue, despite the incongruous Rule 59 caption, and because defendants are still well within the Rule 60(b)(5) "reasonable time" filing limitation, it would be the most hollow formalism for us to dismiss the motion as improperly brought and await a re-labelling of the pleadings. Accordingly, we will consider defendants' argument as though it were in title as well as fact a 60(b)(5) motion.

■ Among the showings that may justify vacation of a restraint under Rule 60(b)(5) is proof of a subsequent change in the controlling facts on which the injunction rested.  7 *Moore's Federal Practice* at 334.  A motion for relief from judgment on such grounds is addressed to the sound discretion of the district court and "its exercise of that discretion will not be disturbed unless there was clear error and abuse of discretion." *Securities Exchange Commission v. Warren*, 583 F.2d 115, 120 (3d Cir. 1978).  *See Girard Trust Bank v. Martin*, 557 F.2d 386 (3d Cir.) *cert. denied*, 434 U.S. 985, 98 S.Ct. 612, 54 L.Ed.2d 479 (1977); *Virgin Islands National Bank v. Tyson*, 506 F.2d 802 (3d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).  In exercising our discretion we are to be guided by equitable principles, as the Rule expressly instructs, and by the interests of justice, 7 *Moore's Federal Practice* at 331.  Although Rule 60 unmistakably envisions the dissolution of certain restraints, the Third Circuit, citing the need for the finality of judgments, has recently cautioned that injunctions "are not to be lightly vacated." *Securities Exchange Commission v. Warren*, 583 F.2d at 122.

Indeed, our Circuit last year reversed, as an abuse of discretion, a district court order

---

1. The precise language defendants purport to move under is in Rule 59(a)(2):

 "A new trial may be granted  .  .  .  in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States.  On a motion for a new

trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

granting relief from a consent injunction prohibiting confinement of prisoners in a basement facility, known as the Behavioral Adjustment Unit (BAU), at the State Correctional Institution at Pittsburgh. In *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir. 1977), the Commonwealth sought dissolution of the restraint decree under Rule 60(b), without offering any evidence of changed circumstances in the B.A.U. The trial court's approval of defendants' request was held insupportable "because the record [was] barren of facts indicating any entitlement to 60(b) relief." *Id.* at 1163. In his opinion for a unanimous panel, Judge Layton expressly noted that because intolerable physical conditions had been one of the sources of the complaint a showing that "the physical conditions existing in the B.A.U. had been improved" would be probative of changed circumstances justifying a vacation of the consent judgment. *Id.* at 1164.[2] Our duty here, then, is to determine, consistent with the above considerations, whether the changed conditions in the Glass Cage that defendants have proven eliminate the cruel and unusual elements on which our original decision rested such that continued application of the injunction against use of the observation unit is inequitable.[3]

III. THE EIGHTH AMENDMENT ISSUE:

■ A federal court asked to determine the constitutionality of a prison unit "cannot dictate to state officials the conditions which the court may feel, as a matter of enlightened and advanced prison theory, should prevail in state penitentiaries." *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. at 895. State authorities are to be allowed broad latitude in regulating the prison environment in light of the acknowledged penological goals of deterrence, rehabilitation and institutional security, *Jones v. North Carolina Prisoners Labor Union, Inc.*, 433 U.S. 119, 125–26, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell v. Procunier*, 417 U.S. 817, 822–26, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and only when penal conditions amount to cruel and unusual punishment should a federal court exercise its remedial powers. However, if cruel and unusual circumstances are proven, we are not only authorized to intervene, *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), but are duty-bound by the Eighth Amendment to do so.

■ Because the concept of cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), a static Eighth Amendment test cannot be articulated. Certain fundamental measurements can, however, be stated. Of particular relevance as a departure point here is the clear determination that solitary confinement is not *per se* impermissible under the Eighth Amendment. *U. S. ex rel. Tyrrell v. Speaker*, 471 F.2d 1197, 1202 (3d Cir. 1973). Equally clear, though, is that "confinement in which the isolation cells provided inadequate space, heating, ventilation, lighting or sanitary conditions or where the inmates received inadequate items of personal hygiene, food or clothing, [is] cruel and unusual punishment." *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. at 896 (citations omitted). In holding the unimproved Glass Cage unconstitutional, we pointed to such physical factors, writing that "we were genuinely shocked by the dark, dirty, and totally isolated conditions we observed." *Id.* at 898. The characterization of our reaction to conditions in the observation cells as "genuinely shocked" was advised, because "physical and mental abuse

---

2. The *Securities Exchange Commission v. Warren* panel, in its discussion of *Mayberry*, reiterated the centrality of evidence of improved physical conditions to a 60(b) motion for relief from an order that confinement facilities not be used. *Securities Exchange Commission v. Warren*, 583 F.2d at 119 n. 6.

3. Plaintiffs do not contend that even if we conclude that the improved Glass Cage is constitutional we should nonetheless deny defendants' motion for relief. Our answer to the constitutional question will therefore *a fortiori* decide the 60(b)(5) issue as well.

. . . . of such base, inhumane, and barbaric proportions so as to *shock and offend a court's sensibilities," Burns v. Swenson,* 430 F.2d 771, 778 (8th Cir. 1970), *cert. denied,* 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972) (emphasis added), is constitutionally proscribed.

Defendants contend that conditions in the Glass Cage are no longer shocking or offensive. At a hearing held October 27, 1978 the parties stipulated to several improvements in the three Huntingdon cells, including: (a) the repair of all faucets and commodes to an operating condition; (b) the placement of removable mattresses in each of the units; (c) the fresh painting of the cells and adjacent area; and (d) the dispelling of a pervasive unpleasant odor. Further, plaintiffs' counsel told us at the hearing that on an October 22, 1978 visit to Huntingdon he had found the Glass Cage area to be "immaculately clean." This renovation, largely accomplished in late 1977, is evidenced by sixteen photographs that defendants introduced with the testimony of Mr. Hewitt, the corrections official in charge of the Huntingdon facility. Supplementing the pictures and statements of Superintendent Hewitt was the testimony of Robert K. Rhodes, Director of Maintenance and Construction, Pennsylvania Bureau of Corrections. We heard from Mr. Rhodes that the ventilation, lighting and size measurements for the Glass Cage meet the relevant standards. Not only was Mr. Rhodes' technical testimony not contradicted by plaintiffs, it was corroborated by the statements of their own expert, Dr. James H. Gilfoil.

In addition to improving physically the controversial cells, the Commonwealth has, since our last consideration of the issue, adopted explicit administrative procedures for placement of an inmate in the Glass Cage. According to the testimony of William C. Robinson, Commissioner of the Bureau of Corrections, before 1977 the controversial cells were indiscriminately used for punitive purposes. In June of 1977 the Commissioner decided that the Glass Cage should be used only as a short-term isolation facility for inmates whose segregation was necessary to protect the institution from disruption or the inmate from other prisoners or from himself. To implement this change of policy, approval by the Deputy Commissioner of Corrections is now required before an inmate can be assigned to the observation cells. The procedures call for Superintendent Hewitt to be informed of a proposed placement and for him then to clear the assignment with the Deputy Commissioner. Approval by the Commissioner's office is to be renewed every twenty-four hours. Once approved, an inmate's confinement in the Glass Cage is governed by internal Huntingdon rules that require an immediate medical examination and psychiatric attention within the next day. State Correctional Institution at Huntingdon: Administrative Directive 801—Assignment of Inmates to Cells in Disciplinary Custody Maximum—Observation—November 15, 1977. Between the time that these procedures were adopted in June 1977 and the closing of the isolation cells in May 1978 pursuant to our Order, ten inmates were confined in the Glass Cage, for an average of six days each. Plaintiffs express skepticism that the new procedures are significant, but they do not question that the rules were in good faith followed in those ten placements.

█ Although we did not discuss the procedure for use of the Glass Cage in our opinion closing the area, we think that the purpose for and manner in which the cells are used is relevant to their constitutionality. Confinement that would be permissible if for a short time may become cruel and unusual if lengthy. Similarly, conditions that would be allowable if monitored may be intolerable if unregulated. Our reference to the duration and nature of confinement in the solitary units at Graterford and Dallas, *Imprisoned Citizens Union v. Shapp,* 451 F.Supp. at 896–97, suggests our implicit reliance on such factors in determining the constitutionality of a facility. Accordingly, we will include the new procedures for

placement in the Glass Cage in our Eighth Amendment calculus.[4]

Despite improved conditions and procedures, confinement in the Glass Cage is still harsh. The Huntingdon institution contains 1165 cells, 144 of which constitute the maximum security area. Within the maximum block is a Disciplinary Custody Maximum (DCM) unit of 17 cells. The observation cells are isolated behind a glass wall within this DCM area. Four steel doors separate the Glass Cage from the general prison population. A prisoner is not allowed to take personal property to the isolation cells. He is initially denied personal items, including reading and writing material, because, according to Superintendent Hewitt, such property can be used by an agitated inmate to flood the cell by jamming the plumbing fixtures. However, if a calm, lucid request is made, a prisoner will be permitted to read and write. The parties agree that the lighting in the Glass Cage, which comes entirely from 75 watt bulbs mounted directly outside each cell and in the vestibule area between the cells and the glass wall, is adequate for reading.

Dr. Gilfoil, a psychiatrist who toured Huntingdon on October 22nd and testified for plaintiffs at the October 27th hearing, stated that the lighting, although dim, was sufficient for reading, and Mr. Rhodes, the maintenance supervisor, testified that the isolation cells are as well lit as an average home. We must thus conclude that our 1975 observation that "[o]utside lighting is totally inadequate for reading" *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. at 898, is no longer accurate. The lighting cannot, however, be controlled from the observation cell, nor can an inmate confined in the Glass Cage regulate the heat or ventilation. The observation cell environment is wholly beyond the control of the prisoner.

We are persuaded that the Glass Cage, although bleak, is no longer cruel and unusual punishment. Our decision is based on the physical and procedural improvements that the parties agree have been made since our last visit over three years ago. Just as our conclusion then was expressly based on the sensual affront that we experienced in viewing the observation cells, we have here been influenced by the image that emerges from a study of defendants' photographs. The pictures convince us that circumstances have changed to the point where the units, while stark, are not offensive. "There is no question that the cells in the [Glass Cage] are grim and cheerless. Nonetheless, we conclude that these conditions are not so inhumane or base that they shock the court's conscience or violate standards of human decency. Similarly, we find that such confinement is rationally related to legitimate penal goals [of security and deterrence] and thus meets constitutional standards." *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. at 897 (upholding use of B.A.U. at Graterford).

Our judgment, like all cruel and unusual punishment decisions, is largely and necessarily impressionistic, there being no eternal sextant with which to survey the boundaries of the Eighth Amendment. We can and must, however, point to certain objective facts that we find especially significant.[5] When we last toured the cells we found no mattresses. Today there is a removable one in each unit. In 1975 we found the lighting inadequate for reading and the ventilation insufficient. We have

---

4. In *Mayberry v. Maroney*, 558 F.2d at 1163–64, the Third Circuit rejected the district court's holding that a new procedure limiting confinement in the B.A.U. to 24 hours was a changed circumstance justifying relief from the injunction prohibiting use of the cells. We read Judge Layton's opinion as denying the *sufficiency* of such a showing, not its relevance, and therefore consider our conclusion that evidence of new procedures may be weighed to be harmonious with *Mayberry*.

5. That our decision here is, to the extent possible, a critical rather than impulsive one is evidenced by our conclusion that for us, personally, being deprived of reading and writing materials, as inmates in the Glass Cage are, would be *per se* cruel and unusual punishment. We recognize of course that such a deprivation does not, without more, violate the Eighth Amendment. Thus, our private values have been subordinated to a more societal sense of decency in our evaluation of the observation cells.

since learned that the light is sufficient for reading and that the ventilation fan is operating and adequate. The Glass Cage was unclean and pervaded by an unpleasant odor when we visited it. On October 22, 1978 plaintiffs found the area "immaculate." In short, "the dark, dirty and totally isolated conditions we observed" three years ago are now neither dark nor dirty, although the utter isolation of course remains. Because isolation alone, which here is governed by stringent procedures, does not violate the Eighth Amendment, *United States ex rel. Tyrrell v. Speaker*, 471 F.2d 1197, 1202 (3d Cir. 1973), we no longer find the observation cells constitutionally objectionable.

Our conclusion is reinforced by considering the implications of plaintiffs' arguments that the Glass Cage is still cruel and unusual punishment. Two main lines of opposition to our decision are urged.

■ First, plaintiffs have attempted, with good success, to demonstrate that the three observation cells are not necessary to maintain security at Huntingdon. Superintendent Hewitt testified on cross examination that the penological purposes served by the Glass Cage could be, to a degree, accomplished by stripping some of the fourteen other D.C.M. cells which had never been in his experience too heavily populated for such a project to be practical. Were it for us to decide, we would agree with plaintiffs that the Commonwealth's own statements prove that the Glass Cage is not indispensable. However, federal courts do not sit to supervise state prisons, *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and the decision whether to use the observation cells, given constitutionally satisfactory conditions, is "peculiarly within the province and professional expertise of corrections officials." *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). Plaintiffs' disproof of a necessity for the Glass Cage is thus misguided. A showing that the observation cells are so

unnecessary that they are not reasonably related to a legitimate penal goal would be highly relevant, *Imprisoned Citizens Union v. Shapp*, 451 F.Supp. at 895–96, but such is not plaintiffs' argument. Because plaintiffs urge us to enter an administrative thicket beyond the path of Eighth Amendment analysis, we must reject their evidence that the Glass Cage is not needed.

Plaintiffs second and more vigorously urged line of argument is that the observation cells are cruel and unusual punishment because they are inappropriate confinement for a psychiatrically disturbed inmate. Dr. Gilfoil, plaintiffs' expert witness, testified at length about the adverse repercussions that confinement in a sensory deprivation environment like the Glass Cage can have on an already unstable prisoner. He stated his opinion that after one or two days in solitary most inmates have a psychotic episode and recounted his own experience of mild disorientation and visual and auditory hallucinations after a brief time in a Huntingdon isolation unit. Recommending padded cells and constant psychiatric supervision for the class of inmates who would be confined in the Glass Cage under the new guidelines, Dr. Gilfoil concluded that isolation of these prisoners would be "better accomplished in a hospital setting." We again find ourselves agreeing with plaintiffs testimony but lacking authority to decide accordingly.

Clearly, the Glass Cage is not the most desirable facility for a psychiatrically agitated inmate. We certainly think that hospitalization would be better and Superintendent Hewitt agrees, as his frank testimony that the observation cells are inappropriate for "committable,"[6] as opposed to disorderly, prisoners shows. The question before us, however, is not and cannot be whether the Glass Cage is medically desirable confinement. Rather, we must ask whether the observation cells are so undesirable as to be "shocking", "offensive", "inhumane," "base" or "barbaric." The list of

---

**6.** Superintendent Hewitt defined "committable" inmates as those who had posed a direct threat to themselves or others because of an act within 30 days past. These prisoners, Hewitt said, can be committed to a state hospital under Pennsylvania law. 50 P.S. § 4101 *et seq.*

Eighth Amendment adjectives is long but not endless, and undesirable is not among them. Implicit in Dr. Gilfoil's testimony is the conclusion that all solitary confinement is shocking and inhumane punishment because void of sensory stimuli and therefore, in his opinion, psychiatrically unwise. Plaintiffs argued as much in their summation, urging that "it may well be that 'committable' inmates can't be constitutionally confined anywhere in the D.C.M." area at Huntingdon. This position is untenable given the present state of the law in our Circuit. *U. S. ex rel. Tyrrell v. Speaker*, 471 F.2d 1197; 1202 (3d Cir. 1973). Some day, perhaps soon, "the evolving standards of decency . . . of [our] maturing society," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, may condemn solitary confinement, but unless and until that happens medical warnings against sensory deprivation must be admonitory only, not binding on state corrections officials.

CONCLUSION:

■ Because we are convinced that the observation cells at Huntingdon are now constitutionally tolerable, it is no longer equitable that our injunction against their use have prospective application. Despite full respect for the finality of judgments, we will, in light of significantly changed circumstances, dissolve our restraint. We shall, however, make the dissolution contingent on maintenance of the improved cells and sternly caution that a deterioration of conditions in the Glass Cage will not be allowed.